[Civ. No. 2677. Fifth Dist., May 26, 1977.]

ROSS BORBA et al., Plaintiffs and Appellants, v.
SHERMAN THOMAS et al., Defendants and Respondents.

COUNSEL

Dawson, Gillaspy & Ninnis and Thomas C. Sannar for Plaintiffs and Appellants.

Crossland, Crossland, Caswell & Bell and Paul T. Chambers for Defendants and Respondents.

## Opinion

**FRANSON, J.**—We review the propriety of a judgment notwithstanding the verdict in favor of respondents in appellants' action for fraud arising out of a 1968 sale of "excess lands" situated in the Westlands Water District.[1] A jury returned a verdict of $75,000 in favor of appellants based on a finding that respondents misrepresented a material fact in connection with the sale: that there would be "no problem" in getting Bureau of Reclamation approval of the sales price so that "bureau water" would be available to appellants for use on the land.

The trial court concluded as a matter of law that respondents had made no misrepresentation of fact; however, if a misrepresentation of fact were made, appellants were not justified in relying thereon. For the reasons stated below, we agree with the trial court and affirm the judgment.

The facts giving rise to this controversy are as follows: in 1952 the Westlands Water District (hereinafter District) was formed to obtain a water supply for agricultural land situated in the western part of the San Joaquin Valley. In 1960 Congress authorized the San Luis Dam Project in northern California to be administered by the federal Bureau of Reclamation (hereinafter Bureau). In 1963 a water service contract was signed between the Bureau and the District. Under the contract the Bureau delivered water to the District which in turn distributed it to the landowners within the District. However, because of a delay in constructing the distribution system, Bureau water did not become available to the land involved in this action until 1973.

Under federal law "excess landowners" are defined as purchasers of land in excess of 160 acres per landowner. A purchaser of excess land can qualify for Bureau water only if he obtains Bureau approval of the purchase price. The purpose of the law supposedly is to prevent any enhancement in profit by the seller of excess land because of the water

---

[1] Appellants also have appealed from the trial court's order granting respondents a new trial "effective only if, on appeal, the judgment notwithstanding the verdict is reversed" (see Code Civ. Proc., § 629). Because we are affirming the judgment notwithstanding the verdict, the order granting a new trial becomes moot, and the appeal from that order should be dismissed.

project benefits to the land. However, insofar as the reclamation law is concerned, the absence of Bureau approval of the purchase price does not void the sale of the excess lands; it only means that the purchaser will not get Bureau water. Stated otherwise, the purchaser, if he so elects, is free to purchase the land without Bureau water, and the seller is free to sell the land for any price he can obtain.

In 1967 Thomas decided to sell 711 acres of land in the District known as the Gilkey Ranch. He gave Mr. John Matthews, a real estate broker, an exclusive authorization and right to sell agreement with respect to the ranch.

On April 23, 1968, appellant Ross Borba signed and delivered to Matthews a deposit receipt for the purchase of the ranch. The deposit receipt provided a purchase price of $850,000 and expressly stated "buyer waives U.S. Bureau of Reclamation approval of sale." Matthews testified that at the time Borba signed the deposit receipt he told Matthews that he didn't want Bureau approval of the purchase price and would "get the approval later if he wanted it."

Thomas agreed to sell the ranch to Borba for $850,000. Thomas never dealt personally with Borba; his dealings were through his agent Matthews. An escrow agreement for the sale of the ranch was drawn up by Thomas' attorney. Paragraph 9 of the agreement provided: "The closing of this transaction is contingent upon the approval of the price allocated to the lands as set forth in Exhibit '4' by the United States Bureau of Reclamation as provided with respect to the sale and transfer of excess lands under Reclamation laws, rules and regulations. The parties hereto agree that they will cooperate and expeditiously apply for the price approval upon the execution of this agreement and will furnish without delay such information as the representatives of the Bureau of Reclamation may request in connection with the application for price approval. It is understood that the price approval is with respect to the sale of excess lands as that term is used in Reclamation law, rules and regulations. In the event the price allocated to the lands as set forth in Exhibit '3' [sic] is not approved by the Bureau of Reclamation, then this agreement shall be null and void and no rights or liabilities shall flow therefrom either in favor of the parties hereto or either of them or the brokers referred to in paragraph 7 hereof. Buyers shall be entitled to a refund of any deposit made by them. Each party shall pay his own costs and expenses incurred in connection with this transaction and title company charges shall be paid equally by the parties hereto. In this

connection, however, an escrow will not be opened until Bureau approval has been obtained." Paragraph 9 specifically made approval of the $850,000 purchase price by the Bureau a condition precedent to the opening of escrow.

When Borba was shown the escrow agreement, he asked Matthews the function of paragraph 9. Matthews informed Borba that the federal government required price approval in order for the purchaser to get water from reclamation projects. Borba expressed concern about the last sentence in paragraph 9 which stated that escrow would not open until price approval was obtained. Matthews informed Borba it would take 30 to 60 days to get approval which meant that the opening of escrow would be delayed for that period of time. Borba indicated that he had to get on the land promptly to make preparations for the fall crop and that the delay occasioned by the need for price approval was unacceptable. Matthews then offered to consult Thomas and see what could be done about paragraph 9.

A few days later Matthews again met with Borba. Matthews testified that he told Borba that he (Matthews) had consulted with Thomas, and Thomas had said there would be "no problem" getting price approval. Matthews testified that respondent's remark about price approval had "popped out" in a brief conversation he had had with Thomas under a tree in Thomas' office yard and in the presence of Timothy Striker, an employee of Matthews. Matthews described his conversation with Thomas as follows: "I asked him if he thought it would make the Bureau of Reclamation price approval. He said it would." Matthews testified that he remembered the conversation with Thomas because he was astonished that anyone would make such a statement; that in driving away from Thomas' office, he told Striker that he was "amazed that he said it would make it;" that he was astonished "[b]ecause I didn't know anyone would know it would make it. It's an unknown quantity."[2]

---

[2]Matthews was apparently so amazed by Thomas' purported statement that he thereafter wrote out a memo dated "September 1968" on Home Title Company stationery noting his meeting with Thomas and Thomas' alleged statement that the Bureau would approve the $850,000 selling price. The memo also recounted Matthews' conveying Thomas' remark to Borba two days later. However, Jerry Wiehl, who designed the layout and logo for the pad on which Matthews' memo was written, testified that the scratch pad was designed in May of 1972 and the pad itself could not have been in existence prior to June of 1972. Hence, it would have been impossible for Matthews to

Timothy Striker denied ever hearing Thomas' statement and denied being present at any such conversation.

Borba corroborated Matthews' testimony. Borba testified that Matthews told him that he (Matthews) had consulted with Thomas, and that Thomas had said there would be no problem getting approval at that price.

Respondent Thomas testified that he never authorized Matthews to make any representations to Borba regarding price approval. Thomas denied expressing an opinion to anyone that the $850,000 selling price would be approved by the Bureau. He admitted knowledge of the rules and regulations concerning price approval and acknowledged that he made no attempt to get approval on the sale of the ranch to Borba.

Thomas had been a member of the board of directors of the District from 1961 through 1963 and from 1964 through 1966. He attended most of the board meetings during his tenure with the board, and the water service contract between the District and the Bureau and the requirement of price approval for excess land purchases were discussed at these meetings. However, Borba did not know of Thomas' membership on the board of directors of Westlands until long after the sale had been consummated. All that Borba knew about Thomas was that he was a "large landowner" in the District and a "man of integrity."

Following the alleged statement by Thomas through his agent Matthews that there would be no problem getting Bureau approval of the sales price, Borba requested that paragraph 9 be deleted from the agreement. Paragraph 9 was then crossed out and Borba initialed the deletion. Borba again told Matthews that he wanted to get prompt possession of the land to begin farming for the coming year; that he would apply for Bureau water at a later time.

Borba signed the agreement on August 26, 1968, and Matthews took it to Thomas for his signature. When Thomas inquired about the deletion

have written the memo on the pad in September of 1968. Matthews' lack of credibility, however, cannot be considered in reviewing the judgment notwithstanding the verdict. (*Hale* v. *Farmers Ins. Exch.* (1974) 42 Cal.App.3d 681, 690 [117 Cal.Rptr. 146].) Moreover, even if Wiehl's testimony is deemed to render Matthews' testimony about Thomas' statement "inherently incredible," (*Hale* v. *Farmers Ins. Exch., supra,* 42 Cal.App.3d at p. 690) the testimony of Borba remains uncontradicted so that we must assume for purposes of reviewing the judgment that Matthews in fact made the statement to Borba.

of paragraph 9, Matthews told him that Borba said he didn't want Bureau water at that time and would get the water later.

Borba testified that Thomas' alleged statement that price approval would be no problem induced him to purchase the land. He said that when he purchased the land it was his intention to irrigate it with Bureau water when it became available. He believed Thomas' statement about Bureau approval to be true, and he testified that he would not have purchased the ranch had he known the statement to be untrue.

On cross-examination, however, Borba admitted that he knew there had been no Bureau approval at the time of sale; that he was aware that approval was a prerequisite to obtaining water. He also acknowledged that he had never talked to Thomas directly about getting approval and that the only person who communicated with him about the purchase of the land was Matthews.

Borba himself had farmed several ranches in the District on a lease basis for many years prior to his purchase of the Gilkey Ranch.

From the time the agreement was signed in 1968 until Bureau water was first available in 1973, Borba made no inquiry concerning Bureau approval of the purchase price. He used well water to irrigate the land during this period of time. However, in early 1973 one of the wells caved in and Borba instructed his son to call the District to obtain Bureau water. At that time he was told that the property did not qualify for water because the Bureau had not approved the 1968 sales price. Borba then requested the Bureau to appraise the land as of 1968. A Bureau appraiser thereafter informed him that the sales price of $850,000 was $109,500 more than the price that would have been approved. The Bureau informed Borba that he would be unable to obtain water unless Thomas reformed the 1968 agreement to a price that would be approved. Thomas refused to reform the agreement and this lawsuit followed.

## DISCUSSION

We first recite the rules for reviewing a judgment notwithstanding the verdict.

"In making the order granting the motion for judgment notwithstanding the verdict, the trial court may not weigh the evidence or judge the

credibility of the witnesses, as it may do on a motion for a new trial, but must accept the evidence tending to support the verdict as true, unless on its face it should be inherently incredible. Such order may be granted only when, disregarding conflicting evidence and indulging in every legitimate inference which may be drawn from plaintiff's evidence, the result is no evidence sufficiently substantial to support the verdict.

"On an appeal from the judgment for defendant notwithstanding the verdict, the appellate court must read the record in the light most advantageous to the plaintiff, resolve all conflicts in his favor, and give him the benefit of all reasonable inferences in support of the original verdict. (*Quintal* v. *Laurel Grove Hospital* (1964) 62 Cal.2d 154, 159 . . .)." (*Hale* v. *Farmers Ins. Exch., supra,* 42 Cal.App.3d at p. 690.)

▪ In the present case, the alleged misrepresentation is Thomas' statement to Borba through Matthews that there would be "no problem" in getting Bureau approval of the $850,000 purchase price. We hold that under the circumstances such a statement does not qualify as a misrepresentation of fact, but is merely a nonactionable expression of opinion by Thomas.

▪ Generally, an actionable misrepresentation must be made as to past or existing facts. "[P]redictions as to future events, or statements as to future action by some third party, are deemed opinions, and are not actionable fraud." (4 Witkin, Summary of Cal. Law (8th ed.) Torts, § 447, p. 2712.) There are, however, three recognized exceptions to the general rule: (1) where a party holds himself out to be specially qualified and the other party is so situated that he may reasonably rely upon the former's superior knowledge; (2) where the opinion is by a fiduciary or other trusted person; (3) where a party states his opinion as an existing fact or as implying facts which justify a belief in the truth of the opinion. (4 Witkin, Summary of Cal. Law (8th ed.) Torts, §§ 448-450, pp. 2712-2715.)

▪ There is no evidence whatsoever that Thomas held himself out to be specially qualified on the subject of Bureau approval of the purchase price. Borba admitted that the only thing he knew about Thomas was that he was a large landowner in the area and a man of integrity. He admitted that he did not know that Thomas had been a member of the board of directors of the District until long after the sale had been consummated. Thus, the only inference to be drawn from the evidence is that as far as Borba was concerned at the time of the

negotiations leading to the sale, he was just as knowledgeable as Thomas concerning the necessity of and procedural requirements for Bureau approval of the sales price.

Moreover, there is no evidence to support a finding that Thomas was in a fiduciary or trust relationship with Borba; Thomas dealt with Borba only on an arm's length basis in a commercial endeavor to sell his land.

It is the third exception under which Borba apparently claims that Thomas' statement constituted an actionable representation. In essence he asserts that the statement that there will be "no problem" in getting Bureau approval was an affirmation or prediction of a future event which reasonably could be interpreted as implying knowledge by Thomas of particular facts which made his prediction probable. Borba argues that because he did not know of the falsity of such facts, the statement qualifies as an actionable misrepresentation. (See Rest., Torts, §§ 539, 525, com. e; 4 Witkin, Summary of Cal. Law (8th ed.) Torts, § 449, pp. 2713-2714.)

However, in all of the cases upholding this theory of an actionable misrepresentation, there is one common thread: the relationship of the parties and the circumstances under which the opinion was expressed were such as to imply a superior knowledge by the defendant of the subject matter of the representation. For example, a statement by an architect to an owner that a building will not cost more than a certain amount may be regarded as an affirmation of fact (*Edward Barron Estate Co.* v. *Woodruff Co.* (1912) 163 Cal. 561, 574 [126 P. 351]). The same is true where an agent states that his principal will advance money to harvest a crop (*Langley* v. *Rodriguez* (1898) 122 Cal. 580 [55 P. 406]), or where a corporation agent represents that the corporation will lease certain property or locate a plant in a certain city (*Eade* v. *Reich* (1932) 120 Cal.App. 32, 35 [7 P.2d 1043]). Also, a representation by a corporation's agent that a particular dividend will be paid within a specified period of time may be actionable (*H. W. Smith, Inc.* v. *Swenson* (1930) 105 Cal.App. 60, 63 [286 P. 1050]). So too, a representation by the seller of a motel that plaintiff could keep it rented all the time—reasonably implies knowledge of past full occupancy (*Daniels* v. *Oldenburg* (1950) 100 Cal.App.2d 724, 728-729 [224 P.2d 472]).

In the present case, there were no facts attending the statement by Thomas which would support a reasonable inference by Borba that Thomas had superior knowledge concerning Bureau approval of the

sales price. There is nothing to suggest that Thomas had access to any fact concerning Bureau approval which Borba himself did not possess. Moreover, the inclusion by Thomas of paragraph 9 in the escrow agreement which was solely for Borba's benefit and which provided that if Bureau approval was not obtained by Borba the sale would be null and void, viewed in the light of Borba's express waiver of Bureau approval in the deposit receipt four months earlier, forecloses any implication by Thomas of facts justifying a belief in the truthfulness of his statement. Manifestly, when Borba deleted paragraph 9 of the agreement, he was acting on his own volition free of any influence by Thomas.

■   Appellants' next argue that even if respondent's alleged statement regarding price approval was not an actionable misrepresentation, Thomas is still liable for nondisclosure to Borba of material facts: the mechanics of price approval by the Bureau. Unquestionably, the duty to disclose may arise without any confidential relationship where the defendant alone has knowledge of material facts which are not accessible to the plaintiff. (4 Witkin, Summary of Cal. Law (8th ed.) Torts, § 462, pp. 2726-2727.) Apparently, appellants contend that respondent should have advised them of the necessity of a Bureau appraisal of the value of the land without the projected water benefits and of the possibility that the $850,000 sales price would not be approved. However, paragraph 9 by its terms effectively suggested to Borba the mechanics of Bureau approval. Additionally, the details of price approval were within easy reach of Borba; he had only to make inquiry with the Bureau. Thus, Thomas was under no duty to disclose any information to Borba.

■   Apart from whether Thomas' expression of opinion can be construed as a misrepresentation of fact, there is another fatal defect in appellants' action. Appellants cannot be said to have justifiably relied on Thomas' statement about Bureau approval. Absent some special relationship between the parties, a private person is not entitled to rely on the opinion of another private person concerning the future decisions of a public body. For example, in *Holder* v. *Home Sav. & Loan Assn.* (1968) 267 Cal.App.2d 91 [72 Cal.Rptr. 704], purchasers of real property brought an action against a lender for fraudulent misrepresentation and concealment as to amounts of payments of taxes on real property. The defendant had underestimated the assessed values to be placed on the property and therefore underestimated the future taxes to be charged by the county assessor. In affirming a judgment notwithstanding a jury verdict in favor of the plaintiffs, the court held:

"In general, reliance may be made by a buyer of real estate upon representations as to *existing* tax liens, amounts of taxes for current or prior years, or assessed values for current or former years. [Citations.]

"  .    .    .    .    .    .    .  .,  .    .    .    .    .    .    .    .    .    .    .

"The rule is different as to statements with regard to *future* assessments or levies of taxes. The fixing of assessed values of property and of tax rates is solely within the power of public officials, whose decisions are not and should not be subject to control by a property owner, so that representations made by a private person as to such matters may not justifiably be relied on. [Citations.]

"Under the facts of the present case, we are of opinion that the estimates made by [defendant] as to the amounts necessary to be paid monthly to take care of future taxes could not reasonably be relied upon as statements of what the future taxes would be." (Italics added.) (267 Cal.App.2d at pp. 106-107.)

In the present case, the statement that there would be no problem getting Bureau approval is a representation of future conduct of public officials. Thus, Borba had no right to rely on Thomas' expression of opinion concerning the future decision of the Bureau. This is but another statement of the rule that where there is no relation of special trust or confidence between the buyer and seller, and where the means of knowledge of the pertinent facts are equally available to both parties, neither person can justifiably rely on the expressions of opinion by the other concerning future events. (See 23 Cal.Jur.2d, Fraud and Deceit, §§ 29-31, pp. 71-78.)

The judgment notwithstanding the verdict is affirmed. The appeal from the order granting respondents' motion for a new trial is dismissed.

Brown (G. A.), P. J., and Gargano, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 21, 1977.