[No. B059755. Second Dist., Div. Four. June 28, 1993.]

BERNARDINE S. EDMUNDS, as Executrix, etc., et al., Plaintiffs and Appellants, v.
VALLEY CIRCLE ESTATES et al., Defendants and Respondents.

COUNSEL

Blecher & Collins, Maxwell M. Blecher and Harold R. Collins, Jr., for Plaintiffs and Appellants.

Kinsella, Boesch, Fujikawa & Towle, Dale F. Kinsella and Cathleen Collins for Defendants and Respondents.

## OPINION

**VOGEL (C. S.), J.**—A minority partner sued to recover his share of the proceeds of a sale of partnership property which occurred after he withdrew from the partnership, claiming he had relied on the majority partner's representation that he intended to develop the property and would not sell it in bulk to third persons. The issue on this appeal is whether the representation supports appellants' claim of constructive fraud. We hold that it does not.

### STATEMENT OF FACTS

Arthur E. Edmunds and Edward K. Zuckerman were lawyers, builders, and first cousins. In 1963, Edmunds and Zuckerman formed a partnership to acquire a large piece of acreage in the West San Fernando Valley for residential development. Edmunds owned one-third and Zuckerman owned two-thirds of the partnership and they called it Valley Circle Estates (VCE). Over the years, the partners subdivided the property into several tracts and built homes on the improved lots. In 1985 and 1986, VCE sold approximately 200 finished lots to Urban West for $17 million. Before the sale to Urban West, there were only two other bulk "lots only" sales.[1] In the middle 1960's, approximately 125 lots were sold to Liberty Building. Later, 20 lots were sold to Zuckerman's sons, Robert and Kenneth, and there were a few sporadic sales of individual lots to "spec builders." The predominant business of VCE was the subdivision and building of homes on its real estate holdings, which was accomplished by construction companies owned by Edmunds (Carlton Building Company) and Zuckerman (Zuckerman Building Company). By agreement, Carlton had the right to develop the first one-third of VCE's property which it did until 1967 when Zuckerman Building Company took over.

By 1986, Edmunds and Zuckerman were in their late 60's and were considering and talking about estate planning. With the passage of time they had transferred varying interests in VCE to their children, grandchildren, and family trusts.[2] Although none of the Edmunds children were active in the day-to-day business of VCE, three of Zuckerman's sons, Steven, Kenneth, and Robert, were active in the partnership and were employees of Zuckerman Building Company. Edmunds continued to be involved in the active

---

[1] Bulk "lots only" sales is a term used to describe the sale to third parties of a tract of land with finished lots that are graded and improved and ready for the construction of houses.

[2] Zuckerman's spouse, children, grandchildren, and family trusts are named defendants. Each has acquired some fractional interest in VCE. Even though Edmunds and Zuckerman transferred fractional interests to their respective families and family entities, the aggregate proportionate interests between the Edmunds and the Zuckermans did not change.

management of VCE even though the Zuckermans were developing the property. Edmunds and Zuckerman met regularly for lunch, golf and otherwise, and frequently discussed and reviewed the performance and future of VCE. They also generally conversed about estate planning and other mutual business interests.

Edmunds was particularly interested in not outliving the business he helped to create. He was concerned that his estate was relatively short of cash and incapable of paying estate tax without liquidating considerable real estate holdings. Edmunds did not believe his family's interest would be well served if it was forced to dispose of assets to pay the estate taxes that would accrue on his death. Because the sale to Urban West in 1985-1986 only produced sufficient money to prepay capital gain taxes and to repay sums owed to Zuckerman, the liquidity of Edmunds's estate did not improve.

In 1986, Robert Zuckerman proposed purchasing all of VCE's holdings. The proposal, which penciled out to about $70,000 per acre, was in writing and was given to both Edmunds and Zuckerman. Discussions of this proposal were deferred because of the sale to Urban West and VCE's decision to reevaluate its land holdings in light of the 1986 Tax Reform Act.[3]

In April 1987, Robert renewed his offer to purchase the VCE holdings. Zuckerman responded by asking Edmunds to get an appraisal to establish fair market value. He told Edmunds it was not fair for him to establish the purchase price for his son. With that understanding, Edmunds contacted Charles Coleman of Urban Land Resources Inc., a real estate investment company, and asked Coleman to give him "a ball-park figure which his [Coleman's] company might be interested in paying for this property in the event that the partners did not make an agreement between themselves and might then offer the land for sale to the public." On June 2, 1987, after viewing the VCE property and completing a market study, Coleman (on behalf of J.M. Peters Company) sent Edmunds a written proposal to purchase 140 finished lots in bulk at $114,285 each for a total of $16 million. The proposal contemplated taking 53 nearly finished lots on closing for $7,420,000 cash and deferring the balance for 1 year, with a secured promissory note on the remaining 87 lots. Edmunds told Zuckerman about Peters's proposal and said he (Edmunds) would be willing to sell to Peters. Zuckerman said he was concerned about Peters's ability to perform and the contingent nature of the deal.

Robert Zuckerman offered to buy the 140 lots on the same terms as Peters but asked his father and Edmunds to give him a discount because of his

---

[3]As a result of the restructuring for tax purposes, VCE established a stepped-up basis of $80,000 per lot.

involvement with the partnership. Robert argued that allowing him to continue to build on the VCE property would avoid potential liability that might arise if existing residents were dissatisfied with the quality of homes built by Peters. Edmunds consulted with Zuckerman about Robert's proposal and he suggested that Robert be allowed to buy the 140 lots at $110,000 each for total cash purchase price of $15.4 million. When Robert's brothers, Stephen and Kenneth Zuckerman, learned that Robert would be allowed to purchase the 140 lots, they met with Edmunds, their father, and Robert and urged they be given an opportunity to bid. Zuckerman told Edmunds and his sons that the family bickering over the purchase was taking too big a toll on him and told Edmunds "it's your call." Edmunds then announced he would accept Peters's current cash proposal which would close in two weeks, but offered to let Robert buy at $110,000 per lot if he could raise the funds and perform within the same time constraints. Edmunds told Robert that if he could "beat Peters to the escrow company with [his] check, the deal was [his]." With that assurance Robert left the meeting. After Robert left the meeting, Stephen and Kenneth prevailed on Edmunds to allow each of them to purchase the 140 lots on the same terms as Robert. Edmunds gave his commitment to Zuckerman's sons in writing on August 19, 1987.

Robert, Stephen and Kenneth proceeded to seek financing and were essentially in competition with each other. Zuckerman was deeply concerned the situation was creating a conflict among his children. Zuckerman called a meeting of his family and announced he had a plan to "end the fighting amongst you boys." He proposed that he would buy Edmunds's interest in the 140 lots and keep the property in the family. On August 24, 1987, Edmunds, Zuckerman and Robert met, and Edmunds was informed that Zuckerman was prepared to buy Edmunds's interest in the 140 lots on the same terms Edmunds proposed to Robert, Stephen and Kenneth on August 19, 1987. Edmunds agreed and he and the Zuckermans present set about drafting a memorandum of understanding.

Their agreement, dated August 24, 1987, provided that VCE would acquire Edmunds's equity in the 140 lots for $3,133,333 payable one-half on August 28, 1987, and one-half on September 4, 1987. In addition, Zuckerman agreed to acquire Edmunds's remaining interest in VCE for fair value, ending the involvement of the Edmunds family in VCE. By September 4, 1987, they were paid $3.1 million cash for their interest in the 140 VCE lots and a written agreement provided for the withdrawal of the Edmunds family from the partnership.

Prior to August 24, 1987, and after the bulk sale to Urban West, Zuckerman told Edmunds that Zuckerman intended to build out all remaining VCE

lots. He stated to Edmunds that he did not intend to sell these lots to third parties and wanted to develop the lots as a Zuckerman family enterprise.

At the conclusion of the sale of the 140 lots by Edmunds to VCE, the Zuckerman family was fully in charge of running and managing the partnership business. Robert was the executive manager of VCE and vice-president of Zuckerman Building Company, actively operating VCE with his brother Kenneth. Robert and Kenneth disagreed about how to develop and market VCE's property. Ultimately, Kenneth complained to his father that VCE was incurring losses on the houses Robert was building and expressed concern about future profitability of the operation. In February 1989, Robert was ordered by Zuckerman to stop selling houses. Robert pleaded with his father and mother to reverse the decision but they were firm and Robert resigned from his administrative positions in the partnership and the construction company. Within several days of Robert's resignation, Stephen Zuckerman informed Michael Rosenfeld, the son of the president of the Anden Group, his "family has some property in the San Fernando Valley" and inquired if Anden might be interested. This conversation initiated negotiations for and an ultimate sale of 87 of VCE's 140 lots to Anden for $300,000 each.

Edmunds learned of the sale to Anden in May 1989 and sent a memorandum to Stephen threatening rescission claiming that Zuckerman had told him that he was not going to make bulk sales to third persons. Edmunds's memorandum advises that Zuckerman's expression of intent confronted him with a choice of deferring for five to seven years before he would see any money from the project or realizing cash payment by selling to Zuckerman. Edmunds contends he would have been willing to defer his withdrawal for one or two years to realize an appreciated gain from a bulk sale. He claimed that a "very substantial adjustment is due from the Z's to the E's."

No adjustment was made and this lawsuit followed.

### Discussion

The case was tried without a jury. Judgment was entered in favor of Zuckerman and the trial court made a statement of decision covering 46 specific findings, including the following four which are crucial to this appeal:

"33.  Prior to August 24, 1987 Edward K. Zuckerman told Arthur E. Edmunds that Zuckerman intended to build out all Valley Circle Estate lots. He stated he did not intend to sell these lots to third parties, (i.e., bulk 'lots-only') and otherwise wanted to develop the lots as a Zuckerman family

enterprise. . . . [¶] 37. Edward K. Zuckerman's statements regarding his present intention as to the future disposition of the 140 lots did not constitute an act of constructive fraud against plaintiffs. . . . [¶] 42. Based on past actions of the partnership and Edward K. Zuckerman, Arthur E. Edmunds could not reasonably have relied on the statement, if he did, regarding Zuckerman's present intention as to the future disposition of the lots as one binding on Zuckerman for the estimated length of time it would take to build out the 140 lots. . . . [¶] 44. With respect to Edward K. Zuckerman's statement regarding his present intention as to the future disposition of the lots, such intention was subject to change based upon such considerations as future business judgment, cash needs, a downturn in business, maximizing the return on the partnership's assets, estate and tax planning concerns and the health of the remaining partners."

Edmunds's basic contention is that there was insufficient evidence to support the trial court's findings that (1) Zuckerman's conduct did not constitute constructive fraud and (2) Edmunds could not reasonably rely on Zuckerman's statement of intent. ■ "It is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact." (*Tesseyman* v. *Fisher* (1952) 113 Cal.App.2d 404, 407 [248 P.2d 471]; *Green* v. *Green* (1963) 215 Cal.App.2d 31, 35 [30 Cal.Rptr. 30].) ■ In *Santoro* v. *Carbone* (1972) 22 Cal.App.3d 721, 728 [99 Cal.Rptr. 488] (overruled on another ground in *Tenzer* v. *Superscope, Inc.* (1985) 39 Cal.3d 18, 30 (216 Cal.Rptr. 130, 702 P.2d 212)), the court clearly stated the standard of review applicable here: "Defendant correctly states that fraud must be proved by clear and convincing evidence. [Citations.] But it is the function of the trial court, not the reviewing court, to determine whether that standard has been met, and the trial court's determination of the issue is conclusive where, as here, it is supported by substantial evidence. [Citations.] [¶] . . . [I]t was the exclusive province of the trial court to determine which of two or more reasonable inferences should be drawn; and its findings, based on the inferences drawn, cannot be disturbed on appeal. [Citation.]"

I

FIDUCIARY DUTY OF PARTNERS

■ Edmunds argues that because he and Zuckerman were partners, he had an unqualified right to rely on Zuckerman's statements to him regarding his present intentions to develop VCE's 140 lots as a Zuckerman family enterprise without any bulk "lots only" sales. In essence, he contends that his fiduciary relationship with Zuckerman raises a conclusive presumption of reliance without regard to any of the factual circumstances. We disagree.

The trial court correctly acknowledged in its findings: "The relationship between Edward K. Zuckerman and Arthur E. Edmunds while they were partners in the partnership gave rise to a fiduciary duty running one to the other." This is simply recognition of a fundamental proposition supported by statutory and case authority. (9 Witkin, Summary of Cal. Law (9th ed. 1989) Partnership, § 31, pp. 428-429.) Corporations Code section 15020 provides: "Partners shall render on demand true and full information of all things affecting the partnership to any partner or the legal representative of any deceased partner or partner under legal disability." This mandate for candor does not impair a partner's individual right to express opinions honestly held and not intended to mislead. Edmunds argues to the contrary relying on *Cohen* v. *S & S Construction Co.* (1983) 151 Cal.App.3d 941, 946 [201 Cal.Rptr. 173], and *Borba* v. *Thomas* (1977) 70 Cal.App.3d 144, 152 [138 Cal.Rptr. 565].

*Cohen* involves the sufficiency of a complaint pleading fraud and negligent misrepresentation against a developer and its salesman regarding assurances given to purchasers of a view lot and the enforceability of a set of recorded building restrictions. The reversal in *Cohen* was compelled because the complaint alleged that the developer and salesman held themselves out as having superior knowledge about the enforceability of the restrictions.

*Borba* was an appeal from a judgment notwithstanding the verdict in favor of a plaintiff purchaser of agricultural property who contended that the defendant seller had represented there would be no problem in obtaining governmental approval for the delivery of water. The *Borba* court held that such representation was merely an expression of opinion and, absent a fiduciary relationship, was not actionable.

Both *Cohen* and *Borba* cite 4 Witkin, Summary of California Law (8th ed. 1974) Torts, section 447, page 2712, for the general proposition that a prediction of future events or opinions is not actionable except where a party is presumably possessed of superior knowledge and the other party is situated so as to reasonably rely on that opinion and where the opinion is expressed by a fiduciary or other trusted person. Edmunds correctly argues the exception is applicable to statements of present intention. (See 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 677, 678, 679, 682, 685, pp. 778-780, 784, 786.) However, these propositions, in the absence of facts, do not compel a result favorable to Edmunds as we explain in the discussion that follows.

## II

### GOOD FAITH STATEMENT OF INTENT

There is no evidence that when Zuckerman made his statement of intent to Edmunds he was negotiating to dispose of the property in bulk to some third person; there is no evidence that Zuckerman made any inconsistent statements to others; there is no evidence that Zuckerman was even aware that there was a better deal waiting in the wings until Edmunds sold out. Edmunds halfheartedly insinuates that Zuckerman was not being forthright, by referring to part of the testimony of Kenneth Zuckerman in which counsel persisted in asking: "In the course of the spirited and lively debate that in part came about through the Peters interest in acquiring the 140 lots, did your father ever say that 'I'm not going to sell them now. *It is business as usual for now, but we will revisit this somewhere down the road*'?" (Italics added.) Kenneth answered, "He didn't make that remark." The examination continued with counsel using the phrase "for the time being, . . . business as usual" as a lead in for several other questions. Only by the most strained construction of this testimony could it be concluded that Zuckerman harbored any hidden agenda when he offered to have VCE buy Edmunds's interest. Except for this discreet reference, Edmunds essentially concedes that Zuckerman's comment was made in good faith and was totally innocent. However, he argues that constructive fraud does not require that a fiduciary intend to defraud or profit by his conduct relying on *Vai v. Bank of America* (1961) 56 Cal.2d 329, 342 [15 Cal.Rptr. 71, 364 P.2d 247]; *Lawton v. Strong* (6th Cir. 1957) 249 F.2d 299, 301; and *Estate of Arbuckle* (1950) 98 Cal.App.2d 562, 570 [220 P.2d 950, 23 A.L.R.2d 372]. We disagree.

*Vai v. Bank of America* arises from a claim to set aside a property settlement agreement on the ground that a husband offered to provide his wife with full and complete information about their property. The Supreme Court reversed the trial court's judgment for the defendant holding the husband was a fiduciary and was obligated to fully and fairly disclose all facts relating to the value of the community property. The Supreme Court analogized the husband's obligation to the wife with the obligation of a partner who "[i]n the course of negotiations for dissolution . . . must deal fairly with his copartners and not conceal from them important matters within his own knowledge touching the business and property of the partnership." (56 Cal.2d at p. 339.) Having concluded the husband was in control of the community property and had offered to make a full disclosure, the Supreme Court declined to consider the claims for actual fraud on the ground that constructive fraud had been established and the failure to disclose need not be accompanied by an intent to defraud.

In *Lawton* v. *Strong, supra,* 249 F.2d 299, 301, a sister and her brothers were partners in a family business. The brothers ran the business and offered to buy her interest for $20,000 when in fact it was worth $80,000. They did not reveal the true worth of her interest to her. The sister sued for constructive fraud. The court found in her favor and responded to the brothers' argument that there was no proof of intent with the rubric: "in [the] case of constructive fraud . . . it is not necessary to prove deliberate or intentional fraud." (*Ibid.*)

*Estate of Arbuckle, supra,* 98 Cal.App.2d 562, 570, is a proceeding to revoke probate of will by a beneficiary of a destroyed prior will. The court held that the destruction of the will by the decedent's attorney with whom it was placed for safekeeping resulted in a constructive fraud. His act defeated the wishes and intent of the decedent and "although done in good faith, is, in the eyes of the law, a constructive fraud upon the decedent and the beneficiaries named in the 1933 will and the codicil thereto." (*Ibid.*) The present case does not involve concealment or any act which compromises the implicit objectives of the partnership or Edmunds's interest as a partner. *Vai, Lawton,* and *Estate of Arbuckle* and all similar cases are inapposite to the facts of this case.

Zuckerman's statement was not cast in promissory terms. His expressed view about the future was not a commitment designed to induce Edmunds to sell. It is a fundamental requirement that the statement of intent be false to be actionable. There is no direct or circumstantial evidence that Zuckerman did not intend to do what he said he would do. ■ "A statement as to the intention of either the maker or a third person is an assertion of a fact, his state of mind, just as a statement of his opinion is such an assertion. It is therefore a misrepresentation if that state of mind is not as asserted. However, the truth of a statement as to a person's intention depends on his intention at the time that the statement is made and is not affected if he subsequently, for any reason, changes his mind. In order for reliance on an assertion of intention to be justified, the recipient's expectation that the maker's intention will be carried out must be reasonable. If he knows facts that will make it impossible for the maker to carry out his intention, then his reliance cannot be justified." (Rest.2d Contracts, § 171, com. a, p. 466.)

■ Events following the purchase of Edmunds's interest further confirm Zuckerman's good faith. After August 24, Zuckerman was hospitalized and his health began to deteriorate. Robert and Kenneth managed VCE and continued to develop and build on VCE lots. Because of the ongoing disagreements between Kenneth and Robert, Kenneth gave his father adverse economic projections. Zuckerman ordered Robert to stop selling houses and

Robert resigned. Shortly thereafter Anden offered to purchase 87 of VCE's 140 lots for $300,000 each. This turn of events was not the product of deceit or the breach of any fiduciary duty. It evolved naturally from Zuckerman's failing health, adverse economic projections, sibling rivalry, and the resignation of VCE's executive manager.

It is irrational to conclude that Zuckerman was unalterably bound to continue with VCE as a family enterprise building out the development when economic and personal circumstances changed. ■ "A declaration of intention, although in the nature of a promise, made in good faith, without intention to deceive, and in the honest expectation that it will be fulfilled, even though it is not carried out, does not constitute a fraud. [Citation.]" (*Church of Merciful Saviour* v. *Volunteers of America* (1960) 184 Cal.App.2d 851, 859 [8 Cal.Rptr. 48].) ■ A good faith expression of intent or opinion by one partner to another does not come within the ambit of constructive fraud. (See *Rosenbloom* v. *Adams, Scott & Conway, Inc.* (S.D.N.Y. 1981) 521 F.Supp. 372, 379; *Kashan* v. *Best Metro. Towel & Linen Supply* (1976) 51 App.Div.2d 730 [379 N.Y.S.2d 140].)

### III

#### REBUTTABLE PRESUMPTION OF RELIANCE

■ We have held there is substantial evidence to support the trial court's finding that no false statement was made. We also conclude that, even if there had been a misrepresentation, it would not have availed appellants in this case. The reason, as we shall explain, is that such misrepresentation gives rise to a rebuttable presumption of reliance, but there is substantial evidence overcoming the presumption and supporting the trial court's finding that Edmunds could not have reasonably relied on Zuckerman's alleged statement.

In *Church of Merciful Saviour* v. *Volunteers of America, supra,* 184 Cal.App.2d 851, 861, the plaintiff claimed that an agent of the defendant had violated a confidential relationship and exercised undue influence inducing a gift of real property to the Volunteers of America. The court held that "the existence of a confidential relationship between the parties to a transaction does not dictate the ultimate conclusion that a gift from one to the other was obtained by undue influence, even though it may give rise to a rebuttable presumption to that effect. [Citations.] Such a presumption is overcome by proof that the transaction was fair and free from undue influence. Whether the presumption has been overcome is a question exclusively for the trial court . . . ." (*Ibid.*) ■ The rationale of *Church of the Merciful Saviour*

is that a representation in the context of a trust or fiduciary relationship creates a rebuttable presumption of reasonable reliance subject to being overcome by substantial evidence to the contrary. Edmunds asserts a claim for constructive fraud based on the representation of his partner contending that "in California a partner has the right to rely upon a statement of future action where the opinion is by a fiduciary." As in *Church of the Merciful Saviour*, here there is a fiduciary relationship, but no "right to rely" arises from that fact, only a rebuttable presumption of reasonable reliance is created because of their relationship as partners. In its application, constructive fraud not only expands the range of conduct which may be characterized as fraudulent, it also presumes the element of reliance absent substantial evidence to the contrary. (See *Estate of Gump* (1991) 1 Cal.App.4th 582, 601-602 [2 Cal.Rptr.2d 269].)

This rebuttable presumption implements the long recognized public policy of imposing fiduciary duties upon partners in their relationship to one another. Indeed, this policy is lodged in the statutory and case law of this state. (Corp. Code, §§ 15018-15021; *Laux* v. *Freed* (1960) 53 Cal.2d 512, 522 [2 Cal.Rptr. 265, 348 P.2d 873]; *Wind* v. *Herbert* (1960) 186 Cal.App.2d 276, 284 [8 Cal.Rptr. 817]; *Jacoby* v. *Feldman* (1978) 81 Cal.App.3d 432, 442 [146 Cal.Rptr. 334].) It is more than the simple shifting of the burden of proof to facilitate the determination of a particular action. (Evid. Code, § 605.) ▋ Consequently, Zuckerman had the burden of proving by substantial evidence that Edmunds did not rely on the alleged false statement. Zuckerman has amply met his burden. (*Estate of Gelonese* (1974) 36 Cal.App.3d 854, 862-863 [111 Cal.Rptr. 833].)[4]

## IV

### EDMUNDS DID NOT REASONABLY RELY

During the relevant time period, Edmunds regularly expressed concern about the ability of his estate to pay taxes in the event of his or his wife's death. He contemplated the liquidation of his interest with a view to converting his hard asset equities into cash. He was not interested in dissolving the partnership since that would subject his interest to auction valuations. He testified somewhere about 1985 or 1986 he became interested in having the partnership sell some or all of its assets to provide liquidity for his estate planning. Because of his advancing age, his objective was to generate sufficient cash to effectively protect his family on his death.

---

[4]The rebuttable presumption of reasonable reliance has no effect on proving the basic fact of whether a false representation was made. Edmunds had the burden of proving that element to support his claim independent of the element of reliance. (Evid. Code, § 500.)

When Robert Zuckerman renewed the previously deferred proposal to purchase all of VCE's assets, Zuckerman prevailed on Edmunds to set the price because he believed it was not fair for him to fix values for his own son. Edmunds contacted Coleman and generated an offer from J.M. Peters in June 1987 at $114,000 per lot. Edmunds was directly involved in the negotiations with Peters and comfortable with the offer and generally found it acceptable. In June and early July 1987, Robert informed Edmunds he would be making a competitive offer for the 140 lots. At this juncture the evidence reveals that Edmunds had decided to accept Peters's offer in order to achieve his goal to convert his interest in VCE's real estate into cash.

If Edmunds and Zuckerman had sold to Peters or to Zuckerman's sons, the sale to Anden may well have occurred in any event. In that circumstance, Zuckerman's purported statement would be irrelevant. It is illogical for Edmunds to argue that Zuckerman induced him to sell since he was prepared for both of them to sell their interests to either Peters or to Zuckerman's sons.

Edmunds testified at his deposition that, when Peters amended its original offer and agreed to pay all cash, he decided to accept it "Because it was all cash and because it would avoid a lot of work to be done yet to determine what a truly fair offer would be. And in view of my estate tax situation."[5]

The trial court found that Zuckerman made his inauspicious comment about his intentions prior to August 24, 1987, but did not fix the exact day, month, or year. Edmunds testified it was only by the first week of July 1987 he finally became convinced that Zuckerman would not sell lots in bulk. Edmunds's decision to sell and obtain cash for his interest surfaced long

---

[5]Edmunds's prepossession with cashing out of his interest in the partnership and its real estate is revealed by the following excerpt from his deposition: "Now, at the time I was getting along in years, I was in my late sixties, and so was Mr. Zuckerman, Edward. He was two years older than I was. So we very often rather loosely discussed estate tax planning. [¶] But I found myself in this position. That having received an offer from The Peters Company, which is one of the exhibits that I furnished, their offer was, I believe, 16 million dollars for the land, for one of the parcels of the land. Now, that set a value on the land that I owned, whether I sold or not. And in the event my wife died—in the event I died first or my wife, and then my wife or I secondly, that left a valuation of land just for those parcels we had discussed of around 16 million dollar value. Which at the time of both of our deaths would become taxable at about 55 percent estate tax. And that was a hell of a lot of cash which I didn't have. And I had no immediate hope of getting it out of the partnership, which was by then known as Valley Circle Estates partnership. It included all of the land. [¶] But that parcel that we had been offered on, plus other parcels, made my tax planning from the standpoint of my sons John and Rodney tremendous. In other words, I could easily have had to sell everything I owned in order to pay the tax—I must back up—I wouldn't have had to, but my estate would have, in order to pay the tax that would be due on the value of that land."

before Zuckerman "convincingly" told him he intended to continue VCE as a family enterprise.

It is also significant that Edmunds did not include any reference to Zuckerman's statement of intent in the documentation of the sale of the 140 lots. Edmunds was a sophisticated and successful lawyer and land developer. The August 24, 1987, agreement specifically provides that none of the benefits nor burdens shall inure to the Edmunds and is wholly silent about any representations regarding Zuckerman's intentions or Edmunds's reliance. The omission of the critical representation by Zuckerman from the documentation and negotiations of August 24, 1987, supports the inference it did not induce the sale of Edmunds's interest. (Cf. *Laux* v. *Freed*, *supra*, 53 Cal.2d 512, 522.)

Edmunds was primarily motivated to convert his real estate holdings into cash. To that end, he pursued the offer from J.M. Peters and took the lead in negotiations with Zuckerman's sons. Edmunds knew that Zuckerman's decision to purchase Edmunds's interest was fostered by his desire to resolve the conflict among his sons. As a lawyer, businessman, and developer, he was aware of the risks inherent in the real estate market, and as cousin with a long and close working relationship with Zuckerman, he was aware of the tensions that existed within the Zuckerman family. He could not reasonably believe that Zuckerman would continue to build out VCE if the market changed or his ability to manage and operate the business was impaired. The substantial evidence presented overcomes the presumption of reasonable reliance arising from the fiduciary relationship between Edmunds and Zuckerman.

V

CONCLUSION

The trial court's findings that Zuckerman's statement regarding his intention to build out VCE was not false and that Edmunds could not have reasonably relied on any such statement are supported by substantial evidence. The fact that Zuckerman was unable to fulfill his plan to have VCE continue as a family enterprise does not translate into a constructive fraud. Any other conclusion would either mute all partners from expressing views honestly held or freeze them into untenable economic positions without regard to changing circumstances.

## DISPOSITION

The judgment is affirmed.

Woods (A. M.), P. J., and Epstein, J., concurred.