**Michael SALSTEIN, Plaintiff,**

v.

**HA–LO INDUSTRIES, INC. and Does 1–20, inclusive, Defendant.**

**No. C 98–1486 CRB.**

United States District Court, N.D. California.

Aug. 30, 1999.

---

John M. True, III, Rudy, Exelrod, Zieff & True, San Francisco, CA, for plaintiff Michael Salstein.

John C. Gorman, Gorman & Miller, San Jose, CA, for defendant Ha–Lo Industries, Inc.

### ORDER

BREYER, District Judge.

This action arises from alleged misrepresentations made to plaintiff Michael Salstein by defendant HA–LO Industries when it bought plaintiff's former employer, Red Sail Merchandising ("Red Sail") in the fall of 1997. Now before the Court is defendant's motion for summary judgment. Having carefully reviewed the briefs submitted by the parties and having heard argument on August 20, 1999, the Court DENIES summary judgment in part and GRANTS in part.

### BACKGROUND

The following is a recitation of the evidence viewed in a light most favorable to the plaintiff.

Prior to the acquisition of Red Sail by HA–LO, Plaintiff was employed as director of sales of the Western Region for Red Sail, an affiliate of the Hyatt Corporation ("Hyatt"). Red Sail developed and sold logo merchandise to Hyatt hotels and resorts, and plaintiff had been employed with either Hyatt or Red Sail for 17 years before the acquisition. Red Sail's Chief Executive Officer ("CEO"), John Pritzker, described his job performance as "always excellent, and he proved to be highly talented at sales and motivating a sales team." He worked on a year-to-year "at will" contract that was due to expire on January 31, 1998. The terms of the contract allowed his employer to terminate his employment for any reason, short of discrimination or retaliation.

In June of 1997, plaintiff learned that defendant might be acquiring Red Sail. As the summer passed, he learned that some Red Sail employees would not be going over to defendant because their positions were duplicative and would be eliminated. Plaintiff alleges that he considered severing his employment at that time rather than staying on with defendant because he was aware that as a long-term employee of Red Sail, he would be entitled to severance pay of a certain number of weeks of salary for every year of tenure at the company.

Meanwhile, Pritzker and Paul Lusk, Red Sail's Chief Financial Officer ("CFO"), were negotiating the deal with Greg Kilrea, defendant's CFO, and Marshall Katz, who handled mergers and acquisitions for defendant. According to Pritzker, Kilrea asked him for the names of the employees who would be "indispensable in effecting a successful transition of Red Sail to HA–LO, both in terms of maintaining the continuity of the sales force and in terms of

influencing customers to remain with the company during the transition period." Pritzker identified three employees: Ray Decker, Paul Swider, and plaintiff. Pritzker also testifies by way of declaration that during the negotiations, he had several conversations with Kilrea and Katz in which they assured him that plaintiff "would not be disadvantaged in any way during the period of the earn out." [1] Lusk also states that both Kilrea and Katz told him "that HA–LO was buying a sales and marketing organization, that part of what HA–LO was purchasing was Red Sail's sales and marketing team, and that they had no plans to dismantle that team."

Pritzker and Lusk's concerns about maintaining the sales force were parlayed into the Asset Purchase Agreement ("Agreement") between Red Sail and defendant. Section 5.5 of agreement states:

As of the Closing, Purchaser [HA–LO] covenants and agrees that it shall (i) use its reasonable best efforts to retain Seller's [Red Sail] existing sales force, (ii) for a period of twelve (12) months following the Closing, (a) maintain a commission structure for each salesperson at least as lucrative, as a whole, as that afforded by Seller prior to Closing (unless individual salespersons agree to a change thereof on a case-by-case basis) . . .

Section 6.9 goes on to provide:

Seller shall have used its reasonable best efforts to cause each of Paul Swider, Michael Salstein and Ray Decker to enter into employment agreements with Purchaser on terms and conditions no less favorable than such persons were engaged as employees of Seller prior to Closing and containing such restrictive covenants as Purchaser shall reasonably require.

Pritzker and plaintiff claim that the term "sales force" refers to the entire sales team, including plaintiff, while Kilrea and defendant argue that the term only refers to sales representatives, and not directors such as plaintiff. Defendant also alleges that the agreement contains a provision in which it assumed Red Sail's contracts, a standard integration provision, and a provision which prevents third parties from claiming rights arising from the language of the agreement, although none of these provisions has been entered into evidence.

In July of 1997, plaintiff expressed concern to Pritzker about his position after the transaction. In response, Pritzker showed plaintiff a draft of the Agreement, and read him several paragraphs of the agreement, including section 5.5 and section 6.19. He assured plaintiff "that he should not fear any loss of his job during the earn-out period, both because of these contractual provisions and because of conversations that [he] had with Mr. Kilrea and Mr. Katz." Lusk also relayed to plaintiff that Kilrea and Katz had told him that defendant had no plans to dismantle the sales team. Plaintiff alleges that he decided to stay with Red Sail through the transition and to go to work for defendant after the close of the transaction based on these representations.

According to the deposition testimony of HA–LO's own personnel, even before the consummation of the transaction, executives of defendant had reservations about employing plaintiff after the transition. In at least one meeting before the close of the transaction, Lou Welsbach, CEO of defendant, Richard Magid, Chief Operating Officer of defendant, Larry Seidman, Vice President of Sales and Marketing for defendant, and Kilrea discussed whether

---

1. The "earn out" refers to the one-year period after the close of the transaction. At the close of the "earn out," a portion of the purchase price was paid to Pritzker, contingent on the company's performance during that period. Pritzker maintains, "Mr. Kilrea and Mr. Katz indicated that they intended to keep Mr. Salstein with the company through at least the earn-out period. I paid special attention to these conversations, because I believed that the continued employment of Mr. Salstein, as well as Mr. Decker and Mr. Swider, was essential to maximizing my profits from the sale of the company."

plaintiff had a relevant position in the company. Seidman opposed retaining plaintiff after the transaction because he did not want another sales manager and because plaintiff came from a different corporate culture. The others agreed to take his recommendation under advisement, but would not act because they wanted "to grant John Pritzker his desire." In addition, before the close of the sale, at least three of defendant's salespeople expressed misgivings to Seidman about reporting to plaintiff.

The transition did not go smoothly for plaintiff. Defendant closed its purchase of Red Sail on September 25, 1997. Plaintiff now reported to Seidman and the two held a meeting in early October to discuss the new arrangements. Seidman informed plaintiff that his compensation would now be "performance-based," rather than the high base salary he previously earned at Red Sail. In fact, according to Salstein, his new base salary would be "that of a receptionist." Plaintiff was surprised by the restructuring of his salary and called Pritzker to discuss it with him. Pritzker immediately called Weisbach to express his concern and remind him of their discussions during the negotiating period. Weisbach told him not to worry and said that plaintiff would not be disadvantaged in any way relating to his compensation during the period of the earn-out. Pritzker then relayed these comments back to plaintiff.

On the morning of January 6, 1998, Seidman met with plaintiff and told him that his position was being eliminated because it was duplicative. He was offered the job of "director of sales development," in which he would recruit successful salespeople on behalf of defendant. His other option was a two-months severance package. Plaintiff viewed this offer as a demotion because he had no training as a recruiter and believed that he was being set up for failure. He was given until January 9 to decide whether to accept the offer or to opt for the severance package.

Plaintiff was told to follow up any questions about the position with Magid, and that afternoon, plaintiff left a voice mail with him. In this voice mail, plaintiff said that he was interested in having a discussion with him about the new position and asked for an extension of the deadline, so that he could fully consider whether he should take this new career direction. He did not receive a return call or voice mail from Magid. Plaintiff viewed this lack of response as an indication that this new position was going to be a job for only four months, and that he had no future working for defendant. At some point shortly after the meeting and the voice mail, plaintiff consulted with an attorney, Lisa McCabe Van Krieken.

On January 12, plaintiff wrote a letter to Magid, expressing his disappointment with defendant. He accused defendant of making false representations to him about his job security so that he would stay on through the "critical fourth quarter/year-end period." Then, plaintiff suggested a "counter-proposal," in which he agreed to give up his position for a severance package far in excess of what Seidman had previously proposed. In exchange for this package, plaintiff also agreed to give up all possible legal claims against HA–LO. He wrote:

> Although I certainly would hope to avoid any legal dispute with the company, I also must tell you that I have spoken with an attorney, who believes that I have a very strong fraud claim against HA–LO (which would include claims for punitive and emotional distress damages) under a California Supreme Court case called *Lazar v. Superior Court,* 12 Cal.4th 631, 49 Cal.Rptr.2d 377, 909 P.2d 981 (1996), as well as other potential legal claims (including breach of contract). However, I would prefer to avoid litigation, of course, and I believe that the above proposal adequately compensates me (without considering punitive and emotional distress damages), given the circumstances, while also be-

ing a more than fair resolution for the company.

After reading this letter, Magid made a determination that plaintiff, in light of the fraud claim, could not properly represent the company as a recruiter.[2]

On January 22, Van Krieken and Gary Walt, an attorney representing HA–LO, had a telephone conversation, which is described by Van Krieken as follows:

> In the course of this conversation, I informed Mr. Walt of Mr. Salstein's concerns about the Director of National Sales Development position, including that the position had no guaranteed salary and that neither Mr. Salstein nor HA–LO had any experience in recruiting. I told Mr. Walt that Mr. Salstein would stay on at HA–LO and perform any and all job responsibilities HA–LO chose to assign to him, including those associated with the Director of National Sales Development position, if the parties were unable to come to an agreement on severance. I also told Mr. Walt that Mr. Salstein would pursue his legal remedies for fraud and wrongful demotion if he were required to accept the Sales Development position.

The next day, January 23, Kilrea told plaintiff to turn in his keys and that he should not come to the office anymore.

On January 26, plaintiff sent a letter to Seidman and Van Krieken sent a letter to Walt, although neither of these letters has been received in the record. On January 27, Walt replied to Van Krieken that defendant was allowing plaintiff's contract to expire because plaintiff could not effectively recruit new salespeople if he was simultaneously suing defendant. In the letter, Walt stated:

> Last week, you advised me that if an acceptable severance package cannot be negotiated between our clients, Mr. Salstein would be prepared to accept this

new position with HA–LO but would pursue his claims (which HA–LO expressly denies) which were stated in Mr. Salstein's letter of January 12, 1998, our subsequent telephone conversations and your letter to me of January 26, 1998.

Kilrea's response to plaintiff's letter to Seidman contains similar language: "Your letter also refers to a communication from your attorney 'that if we could not reach an agreeable severance package, (you) would stay on in whatever role HA–LO assigned to me ...' ... However, you omitted the fact that she told us that you would simultaneously be filing a lawsuit against us."

Plaintiff subsequently filed his complaint in San Francisco Superior Court on March 17, 1998, and defendant removed to this Court on April 13, 1998. Defendant now moves for summary judgment.

### LEGAL STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is "material" only if it could affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202, (1986). A principal purpose of the summary judgment procedure is to identify and to dispose of factually unsupported claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When "the record taken as a

---

**2.** In his deposition, Magid fully explains when and why he terminated HA–LO's relationship with plaintiff: "At some point in time here when he took it a step beyond finding legal counsel, obviously we encourage people to make sure that they're adequately represent-

ed. But when it took a much more adversarial tone to it, obviously it had an impact on his ability, we believe, to recruit on our behalf and represent the company. At that point I didn't believe it made sense for him to continue, even if he had accepted."

whole could not lead a rational trier of fact to find for the non-moving party, there [is] no genuine issue for trial." *Matsushita Elec. Ind. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## DISCUSSION

Plaintiff's complaint contains two causes of action. The first cause of action accuses defendant of fraudulently inducing him to continue his employment with defendant through the transition, and the second accuses defendant of violating public policy by firing him for hiring legal representation. Each of these claims are addressed in turn.

### A. Fraud Claim

"The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar v. Superior Court,* 12 Cal.4th 631, 638, 49 Cal.Rptr.2d 377, 909 P.2d 981 (1996). " 'Promissory fraud' is a subspecies of the action for fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud." *Id.* "An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract." *Id.* "In such cases, the plaintiff's claim does not depend upon whether the defendant's promise is ultimately enforceable as a contract. If it is enforceable, the [plaintiff] ... has a cause of action in tort as an alternative at least, and perhaps in some instances in addition to his cause of action on the contract.' " *Id.*

Defendant argues that no reasonable trier of fact could find that: 1) it made a misrepresentation to plaintiff, 2) it had knowledge of the falsity of these representations, 3) it intended to defraud plaintiff or induce reliance, or 4) plaintiff justifiably relied on these representations.

### 1. Misrepresentation

■ Defendant argues that it made no misrepresentation because: 1) it made no direct representations to plaintiff during the negotiations, 2) the pre-acquisition representations are not actionable, and 3) the statements are not sufficiently certain to give rise to an action for fraud.

### a. Indirect Representation

Defendant first contends that the evidence does not demonstrate that it either requested or expected any of its alleged representations to be conveyed to plaintiff.

In *Varwig v. Anderson–Behel Porsche/Audi Inc.,* 74 Cal.App.3d 578, 141 Cal. Rptr. 539 (1977), California adopted the doctrine of indirect representation, as set forth in Restatement of Torts (Second) § 533. The court held in relevant part:

> The maker of a fraudulent misrepresentation is subject to liability to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends *or has reason to expect* that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct. . . . It is not necessary that the maker of the representation have any particular person in mind. It is enough that he intends or has reason to expect to have it repeated to a particular class of persons and that the person relying upon it is one of that class.

*Id.* at 581, 141 Cal.Rptr. 539 (emphasis added). However, "the maker of the misrepresentation must have information that would lead a reasonable man to conclude that there is an especial likelihood that it will reach those persons and will influence their conduct." *Geernaert v. Mitchell,* 31 Cal.App.4th 601, 607, 37 Cal.Rptr.2d 483 (1995).

The record demonstrates a genuine issue of fact as to whether defendant made such representations. It is undisputed that Pritzker and Lusk told Kilrea and Katz that plaintiff was among three employees who were critical for the transition and that Kilrea and Katz gave at least some assurance to Pritzker that defendant would employ plaintiff at the same terms. Indeed, these negotiations were later formalized in section 6.9 of the Agreement, which named plaintiff as an employee who was critical to the success of the transition. In light of plaintiff's special place in the negotiations, a reasonable trier of fact could determine that defendant had reason to expect that there was an "especial likelihood" that its representations about plaintiff's position in the new company would reach plaintiff, regardless of whether defendant either authorized or actually knew of such a result.

### b. Actionability of Representations

HA–LO argues that the alleged representations are not actionable because they were mere expressions of opinion. It contends that it only gave plaintiff its opinion that he could expect to be given a fair opportunity to perform for defendant based upon the information about his abilities provided by Pritzker.

In general, "predictions as to future events, or statements as to future action by some third party, are deemed opinions, and are not actionable fraud." *Borba v. Thomas*, 70 Cal.App.3d 144, 152, 138 Cal. Rptr. 565 (1977). However, plaintiff does not allege that defendant made a "prediction" of a future action. Rather, he presents evidence that defendant made a false promise to employ plaintiff through September 1998. Plaintiff points to the comments from Kilrea and Katz to Pritzker and Lusk, and to the Agreement to demonstrate that such a promise was made by defendant. Thus, the alleged representations are not "expressions of opinion" and the *Borba* analysis does not apply.

### c. Sufficiency of Representations

Defendant next argues that the statements alleged by plaintiff were not sufficiently certain to give rise to an action for fraud. *See e.g., Conrad v. Bank of America*, 45 Cal.App.4th 133, 156, 53 Cal. Rptr.2d 336 (1996) (holding that an agreement on the part of the Bank to process a loan application was not a sufficient representation to plead fraud when the Bank turned down the loan)

However, the record demonstrates that Kilrea and Katz may have had a number of conversations with Pritzker and Lusk in which Kilrea and Katz assured them that plaintiff would be employed through the earn out period. Furthermore, the stated promise in the purchase agreement to continue the employment of the sales force for a year at the same commission structure provides further evidence that plaintiff's allegations are sufficient to plead fraud. Thus, a reasonable trier of fact could find that the representations of defendant at the negotiations were truly expressions of intent to keep plaintiff for one year after the close of the purchase. Therefore, plaintiff's allegations are sufficient to survive summary judgment.

### 2. Knowledge of Falsity

The second element of fraud is defendant's knowledge of the falsity of the representation. Defendant argues that it did not knowingly say anything false regarding Salstein's future employment. Defendant points out that after the close of the agreement in late September, it notified plaintiff that it would be evaluating its position and responsibilities.

A reasonable trier of fact, however, could find that Kilrea and Katz knew that they were making false statements to Pritzker and Lusk when they reassured them of plaintiff's place in the company. The record demonstrates that Seidman, who was to be plaintiff's supervisor after the acquisition, wanted to eliminate plaintiff's position and had a discussion with Kilrea, Magid, and Weisbach on this issue.

Each one of them was therefore on notice that plaintiff's existing job was in a precarious position. A reasonable trier of fact might also find that the events immediately after the transition, such as plaintiff's negative evaluation, and the decision to eliminate his position a mere three months after the closing of the agreement, indicate that defendant never intended to keep plaintiff past the transition. In short, a reasonable trier of fact could find that defendant knew of the falsity of its representations.

### 3. Intent to Induce Reliance

The third element of fraud is defendant's intent to induce plaintiff's reliance on its representations. Defendant argues that the alleged promises by defendant are too vague and that defendant had no knowledge and did not anticipate that Pritzker would convey its representations to plaintiff.

These arguments do not address the evidence that defendant intended to directly induce the reliance of Pritzker, and indirectly, the reliance of plaintiff. As Magid states in his deposition, defendant knew that plaintiff's immediate supervisor wanted to fire him, but would not remove his name from the list enumerated in section 6.9 of the Agreement because it wanted to "grant John Pritzker his desire." Based on this evidence, a reasonable trier of fact could find that defendant intended to deceive Pritzker—and plaintiff indirectly—in order to consummate the transaction.

### 4. Justifiable Reliance

Finally, defendant contends that plaintiff's reliance on its representations was not justified. Defendant argues that the Court may determine as a matter of law that plaintiff's reliance on defendant's representations is unjustified because plaintiff did not communicate directly with defendant about his future employment. Furthermore, defendant alleges that plaintiff was aware that his contract could be terminated at any time, without cause, by his employer.

"Justifiable reliance is an essential element of a claim for fraudulent misrepresentation, and the reasonableness of the reliance is ordinarily a question of fact.... However, whether a party's reliance was justified may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts." *Guido v. Koopman,* 1 Cal.App.4th 837, 843, 2 Cal. Rptr.2d 437 (1991). Here, a reasonable trier of fact might determine that plaintiff was justified in relying on the statements of Pritzker and the language of the Agreement in deciding to work for defendant. Additionally, whether plaintiff knew that his "at-will" contract could be terminated has little bearing on whether he was justified in relying on an alleged promise to Pritzker that he would be employed through September 1998. Thus, reasonable minds may differ on this issue, and it must be resolved by a trier of fact.

Accordingly, for the reasons stated above, the Court concludes that a reasonable trier of fact could find for plaintiff on all of the elements of fraud. Defendant's motion for summary judgment on this cause of action must therefore be denied.

### B. Public Policy Violation

Plaintiff alleges that defendant violated California Labor Code § 923 because it fired him for seeking legal representation. Defendant argues that section 923 only applies to representation in relation to collective bargaining, and therefore does not protect plaintiff's actions.

■ "Apart from the terms of an express or implied employment contract, an employer has no right to terminate employment for a reason that contravenes fundamental public policy as expressed in a constitutional or statutory provision. An actual or constructive discharge in violation of fundamental public policy gives rise to a tort action in favor of the terminated employee." *Turner v. Anheuser–Busch, Inc.,* 7 Cal.4th 1238, 1252, 32 Cal.Rptr.2d 223, 876 P.2d 1022 (1994) (internal citation omitted). In order to sustain a wrongful

discharge in violation of public policy, plaintiff must prove that his dismissal violated a policy that is 1) fundamental, 2) beneficial for the public, and 3) embodied in a statute or constitutional provision. *See id.* at 1256, 32 Cal.Rptr.2d 223, 876 P.2d 1022.

California Labor Code § 923 states:

Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees. Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In dealing with such employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore it is necessary that the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.

Citing *Montalvo v. Zamora,* 7 Cal. App.3d 69, 86 Cal.Rptr. 401 (1970), plaintiff argues that this statute protects an individual employee who hires an attorney to negotiate terms of employment. In *Montalvo,* three agricultural workers were fired after they retained the services of an attorney to assist them in obtaining back pay that had been improperly withheld by their employer. *Id.* at 72, 86 Cal.Rptr. 401. The complaint alleged that the employer fired the plaintiffs immediately upon receipt of a letter from the attorney demanding the back pay, and that the purpose of the termination was to "interfere with, restrain, and coerce the plaintiffs in the exercise of their right to designate representatives of their own choosing

to negotiate the terms and conditions of their employment." *Id.* The court held that plaintiffs had stated a cause of action, finding that it is "within the intent and scope of the statute, by implication, though not expressly declared, that the individual employee has the right to designate an attorney or other individual to represent him in negotiating terms and conditions of his employment, and that his discharge for so doing constitutes a violation of Labor Code section 923." *Id.* at 75, 86 Cal.Rptr. 401. Specifically, the court stated, "the violation occurs, not in refusing to negotiate, but in discriminating against an employee or employees for exercising his or her rights of self-organization and designation of a representative for the purposes stated in the statute." *Id.*

All evidence on record, however, demonstrates that defendant fired plaintiff because he stated that he would sue them if they did not offer him a more substantial severance package. In his initial letter to Richard Magid, plaintiff did not designate Van Krieken as his representative to negotiate terms of employment, but merely stated that he had consulted with an attorney who informed him that he might have a cause of action for fraud. Almost two pages of that letter detail how defendant has deceived him, and the remaining portion only asks for a better severance package. Similarly, when plaintiff's attorney contacted defendant directly, she merely stated that plaintiff would file a lawsuit if an acceptable severance package were not offered. Defendant responded by indicating that in light of plaintiff's threats, it was no longer willing to offer him the sales development position. Before plaintiff hired an attorney, it had already been made clear that his previous position was being eliminated.

■ Under these circumstances, defendant's conduct cannot be deemed a violation of a fundamental, well-established public policy. A contrary holding would imply that whenever an employer informs an at-will employee that his position is

being eliminated, the employee may create a legal right to his job simply by threatening to sue. And, to the extent that plaintiff contends that defendant violated public policy by withdrawing the sales development offer, as distinct from telling him that his previous position was being eliminated, a finding in favor of plaintiff would mean that public policy precludes an employer from withdrawing an offer of employment whenever the offeree responds by threatening a lawsuit.[3] The *Montalvo* case, which simply involved an assertion of right to payment by an attorney on behalf of several employees, cannot stand for this broad proposition. Nor has plaintiff pointed to any statutory or constitutional provision that would compel such a result. Accordingly, defendant's motion for summary judgment on this cause of action must be granted.

### CONCLUSION

For the foregoing reasons, the motion for summary judgment on the fraud claim is DENIED and the motion for summary judgment on the claim of wrongful termination in violation of public policy is GRANTED.

**IT IS SO ORDERED.**

---

**3.** Put another way, an employer would be precluded from withdrawing an offer even if the offeree takes an action that would irreparably destroy the potential employer-employee relationship.