Filed 1/21/22  Swamp Capital v. Shaw CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SWAMP CAPITAL, LLC,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES SHAW et al.,<br><br>    Defendants and Appellants. | B298436, B301368<br><br>(Los Angeles County<br>Super. Ct. No. BC641097) |

APPEALS from a judgment of the Superior Court of Los Angeles County, Gregory W. Alarcon, Judge.  Affirmed.

Reif Law Group, Brandon S. Reif and Marc S. Ehrlich, for Defendants and Appellants.

John L. Dodd & Associates and John L. Dodd, for Plaintiff and Respondent.

# I. INTRODUCTION

Defendants James Shaw and Arts District Patients' Collective, Inc., (ADPC) appeal from a judgment upon jury verdicts on multiple causes of action in favor of plaintiffs.[1] They contend that there was insufficient evidence to support the verdicts and that the trial court erred in failing to grant a new trial based on flaws in the verdict forms. We affirm.

# II. BACKGROUND

A. *The Parties*

1. <u>James Shaw and ADPC</u>

In the early 2000s, Shaw began cultivating cannabis. In approximately 2005, he started ADPC,[2] a cannabis dispensary in Los Angeles. ADPC held a registration certificate that allowed it

---

[1] In October 2020, this court granted the motion of Swamp Capital, LLC, the assignee of the judgment which is the subject of the appeals, to substitute in as the respondent in place of plaintiffs Sergio Tellez, dba Specialized Development, Polo Capital and Consulting, LLC, Polo Capital and Consulting, LP, and California Institute of Cannabis, Inc.

[2] ADPC is a California nonprofit mutual benefit corporation. Shaw operated ADPC under the dba "Arts District Healing Center." Shaw also operated another nonprofit mutual benefit corporation named "Arts District Unity Center, Inc." Shaw was the managing director of both corporations. We will refer to the two corporations and the dba collectively as "ADPC."

to operate with limited immunity from prosecution under then-existing laws governing the cultivation and sale of cannabis in the city of Los Angeles (the Immunity Certificate).

Over the years, Shaw entered into various business arrangements with others involved in the cultivation of marijuana. He allowed marijuana cultivators to use ADPC's Immunity Certificate to operate and dispense cannabis in Los Angeles in exchange for a percentage of the cultivators' crop. Shaw's deal-making methods varied; and he often used oral agreements that he would later memorialize in writing.

### 2. Sergio Tellez

Sergio Tellez was a licensed general contractor. He began his construction career building homes and, beginning in 2010, focused on the construction of facilities for the cultivation and sale of cannabis. He was also an entrepreneur. In 2014, Tellez invented "Spliffin," a "vaporizing product" cartridge for the consumption of cannabinoids extracted from cannabis plants.[3] Tellez then formed plaintiff Polo Capital and Consulting, LP, as a vehicle for capital infusion into projects like Spliffin. In January 2015, Nikola Andrejich began working with Tellez to develop Spliffin and other related businesses.

---

[3] The parties used the term "Spliffin" to describe both the product and the entity that manufactured and sold it.

B.      *Shaw's and Tellez's Business Relationship*

Tellez and Shaw met in approximately 2014 when Shaw was looking for capital and support to build a dispensary space. Shaw presented a "scheme" to Tellez pursuant to which the two would operate a "health center" that would be exempt from local and state taxation. Shaw offered Tellez a 50 percent ownership interest in ADPC. He also offered to serve as a "compliance expert" for Spliffin, claiming he could help Spliffin operate lawfully in exchange for a cash payment and a 2.5 percent ownership interest in the product. Shaw represented that ADPC's Immunity Certificate would allow Spliffin to operate lawfully from Shaw's dispensary. Tellez, however, had already arranged to develop Spliffin with another cannabis entity that held an immunity certificate. He and Shaw therefore did not agree to work together at that time.

1.      The Oral Agreement

In December 2015, Shaw approached Tellez's business partner, Andrejich, with a new proposal. Shaw planned to move ADPC to a large warehouse at 1411 Wilson Street in downtown Los Angeles (the Wilson site) and to sign a five-year lease for the facility. According to Tellez, he and Shaw came to a "firm" oral agreement to start a joint venture at the Wilson site. Tellez agreed to: "build out" the Wilson site; provide $1.5 million in funding for the renovation; and operate the facility when it was finished.

Shaw agreed to contribute ADPC's Immunity Certificate to operate the venture at the Wilson site and to provide his

4

expertise with the retail aspect of the cannabis business. He also promised Tellez that the two would be 50/50 partners and that Tellez would immediately receive a 50 percent equity interest in ADPC. And, Shaw agreed that Tellez could produce Spliffin at the Wilson site.

Andrejich participated in the discussions about the joint venture and the negotiation of the oral agreement that the parties eventually reached. On December 14, 2015, Andrejich sent Shaw an e-mail with a draft letter of intent (LOI) that contained the terms of the oral agreement.

Tellez would not have proceeded with any agreement with Shaw had it not been for Shaw's Immunity Certificate; nor would he have agreed to the deal if Shaw had not agreed to allow plaintiffs to produce Spliffin at the Wilson site.

### 2. Management Transfer Agreement (MTA)

Shortly after entering the oral agreement, Shaw informed Tellez and Andrejich that they needed to prepare a written MTA to memorialize their business relationship. Andrejich believed that the MTA was intended to memorialize the terms of the oral agreement that Tellez and Shaw had reached. Tellez understood that the MTA was a legal formality; it was merely a "compliance" document needed to prove that the parties could legally operate a cannabis business at the Wilson site under ADPC's Immunity Certificate.

Shaw discouraged Tellez and Andrejich from using their own lawyer to draft the MTA because he did not want anyone else to know about the business arrangement. Shaw told them to hire another lawyer, Jacek Lentz. Shaw claimed that Lentz

5

understood how to prepare the type of agreement that they contemplated.

On December 16, 2015, Shaw e-mailed Andrejich and Tellez an introduction to Lentz, informing them that Lentz would send them a retainer agreement. Tellez paid Lentz $5,000, believing Lentz would represent his interests. He expected that Lentz would draft an agreement incorporating the terms of the oral agreement as described in the LOI.

During discussions about the MTA, Tellez and Andrejich asked Shaw to provide them with ADPC's corporate and financial records. Shaw declined, saying that he would produce them after the parties signed the MTA. Tellez and Andrejich also asked whether ADPC had any outstanding debts or liabilities. Shaw disclosed none.

Tellez and Andrejich met with Lentz in early January 2016 to discuss the MTA. Lentz told them that under the MTA, Tellez would be named a "director" in ADPC rather than being granted an equity ownership interest because equity ownership could not be conveyed in ADPC.

On January 11, 2016, Lentz and Shaw presented a copy of the MTA to Tellez and Andrejich. Tellez only "briefly went through this agreement" in Lentz's office because "there was a sense of urgency in closing the . . . deal."

The MTA included new terms that had not been included in the oral agreement and omitted other terms to which the parties had agreed. Specifically, the MTA made the transfer of 50 percent of the managerial and operational control of ADPC to Tellez conditional upon Tellez's fulfilling specific terms, including investing $1.5 million in the build-out of the location; paying Shaw $2 million during the first two years of the agreement and

6

a monthly salary of $10,000; and transferring $150,000 out of the venture's gross receipts every year to fund a "health center" designed and managed by Shaw. The MTA also gave Shaw authority to hire and fire all personnel for the venture, appoint additional directors, and assume control of the management and operations of the venture. Finally, the MTA included an integration clause which provided that the MTA represented the entire agreement and understanding between the parties governing the subject matter, and superseded all prior agreements, understandings, and representations.

When Tellez and Andrejich inquired about the terms of the oral agreement that had been excluded from the MTA, Shaw assured them that the agreement would be amended to include those terms, including the term that allowed Tellez to develop and operate Spliffin at the Wilson site. Shaw reassured Tellez that the MTA was a "preliminary" document to "get the ball moving" so they could begin the venture. Shaw also explained that the reason the agreement did not include a provision about Spliffin was that "he didn't want people to know that." Tellez signed the agreement in reliance on Shaw's promise to amend the MTA to allow Spliffin to operate at the Wilson site. Tellez would not have signed the MTA if Shaw had not promised to amend it.

3.    Construction Phase

Tellez provided the capital for the renovation of the Wilson site. He also paid the security deposit and the broker fee and began paying the monthly rent of $35,000. In February 2016, construction began at the site.

7

Although he collected his salary and accumulated various expenses, Shaw played no role in the renovation.

In April 2016, Tellez discovered that ADPC had an outstanding tax obligation of over $1 million, which predated Tellez's agreement with Shaw. When Tellez and Andrejich confronted Shaw about the tax liability, Shaw told them not to worry. Tellez would not have signed the MTA had he known about ADPC's tax liability.

Throughout this period, Shaw continued to discuss amending the MTA "many different times," but he never did so. In early May 2016, Tellez, through new counsel, made a written request for modifications to the MTA and ADPC's corporate records. Tellez also requested disclosure of the names and addresses of all ADPC members with voting rights, a copy of the bylaws, and other information. Shaw did not produce the records.

## C.    *The End of the Relationship*

Following the completion of renovations, the Wilson site included five cultivation rooms, and Tellez began operating Spliffin at the site.

During the summer of 2016, Tellez became concerned that Shaw would not amend the MTA as he had promised. Although Tellez sent Shaw records to prove that funds had been expended to renovate the Wilson site, Shaw refused to "acknowledge any of the expense towards the $1.5 million capital investment . . . ." Further, Shaw began to complain about the production of Spliffin at the site. For the first time, Shaw told Tellez that ADPC's Immunity Certificate did not authorize producing Spliffin at the

site. Although he believed that the Immunity Certificate did permit the production of Spliffin at the site, in August 2016, Tellez initially agreed to cease Spliffin's operation. But production of Spliffin resumed shortly thereafter.[4] Shaw knew that Tellez had resumed production of Spliffin at the site in fall 2016.

The first cannabis crop from the Wilson site was harvested in October and after drying and curing, it would have been ready for sale in November 2016. On October 27, 2016, however, Shaw sent Tellez an e-mail accusing Tellez of engaging in the illegal manufacture of Spliffin. Shaw demanded "veto power" concerning "every decision and action that occur[red] in the build-out and operations at [the] Wilson [site]." He also declared his intent to take over all management decisions.

On November 1, 2016, Tellez's attorney responded that Tellez intended to "immediately enforce all of his available rights and remedies," stop work at the site, end payments to Shaw, and cease payments for rent. Tellez also filed mechanic's liens against the landlord of the Wilson site to protect the funds he spent on the site's construction.

On November 4, 2016, Shaw arrived at the Wilson site with four or five men, who were armed, wore bulletproof vests, and carried tactical gear. According to one witness, Shaw and the armed guards "basically busted in like they were the SWAT team going around clearing rooms." Shaw informed the employees at the Wilson site that he was taking over and directed them to

---

[4] Tellez and Andrejich maintained that Spliffin involved cannabis "processing" which was permitted under the Immunity Certificate.

leave immediately.  Shaw admitted going to the facility with "guys with guns" in order to take over the facility, lock Tellez out, and remove him from managing the operations.  The police were summoned to help resolve the dispute.

D.    Other Evidence

In addition to Tellez and Andrejich's testimony above, plaintiffs presented evidence from several others, including Shaw's former business partner Franco Brunetti.  Brunetti testified that he and Shaw had previously entered into a partnership to develop a cannabis dispensary business based on an oral agreement.  Shaw agreed to give Brunetti an ownership interest in ADPC and permission to use ADPC's Immunity Certificate in exchange for Brunetti developing a dispensary site and running its operations.  After operations commenced, Shaw insisted that they execute a written agreement that changed the terms of the deal and excluded the term giving Brunetti an ownership interest in APDC.  Shaw, however, promised to amend the agreement later to add the term.  He never did so and eventually, without notice, moved his ADPC Immunity Certificate to another location.

Shaw also testified at trial.  He denied that he and Tellez entered into an oral agreement that predated the MTA.  According to Shaw, although he and Tellez engaged in a series of oral negotiations in December 2015, the LOI represented only Tellez's opening offer for a deal that the parties continued to negotiate.  Shaw also claimed that the MTA contained the only terms to which the parties ultimately agreed and denied that he agreed to amend the MTA.  Shaw also denied that he agreed to

10

allow Tellez to operate Spliffin at the Wilson site or agreed to amend the MTA. Shaw claimed that he made ADPC's bylaws available to Tellez and told Tellez about ADPC's tax liability before they signed the MTA.

## III. PROCEDURAL BACKGROUND

On November 18, 2016, plaintiffs filed their initial complaint. On February 10, 2017, plaintiffs filed the operative first amended complaint asserting causes of action for (1) fraud and deceit; (2) breach of oral contract; (3) declaratory relief; (4) rescission of the MTA; (5) breach of the MTA; (6) breach of the implied covenant of good faith and fair dealing; (7) negligence; (8) negligent misrepresentation; (9) breach of fiduciary duty; (10) quantum meruit; (11) constructive fraud; and (12) specific performance of the oral agreement.

Jury trial began on December 7, 2018. Defendants requested that the trial be transcribed, but their counsel failed to arrange to have a court reporter present for the first afternoon of trial proceedings. Thus, the voir dire of the jury, the trial court's initial jury instructions, the opening statements, and a portion of Andrejich's direct testimony were not transcribed.[5]

---

[5] According to plaintiffs, during the portion of Andrejich's testimony that was not recorded, Andrejich provided evidence about (1) his initial contacts with Shaw in late 2015 in which Shaw made representations about his business and his intent for the parties' deal; and (2) the terms of the oral agreement that Tellez claimed he reached with Shaw. The portion of Andrejich's testimony that is in our record is consistent with plaintiffs' representation.

11

The jury returned verdicts in favor of plaintiffs for fraud for $1 million; breach of oral contract for $700,000; breach of the covenant of good faith and fair dealing for $400,000; negligence for $300,000; negligent misrepresentation for $600,000; breach of fiduciary duty for $200,000; quantum meruit for $175,000; constructive fraud for $175,000; and $750,000 in punitive damages. On the recission cause of action, the jury returned a verdict that the MTA "should be" rescinded.

On January 25, 2019, defendants filed a written objection to the judgment, arguing that the verdicts were defective. The trial court overruled the objection, signed the judgment, and ruled that the court would not enter the judgment on specific performance of the oral contract until after it conducted an additional hearing. In March 2019, defendants filed a motion for new trial.

On May 9, 2019, the trial court held a hearing on the motion for new trial and the specific performance remedy. The court denied the motion for new trial and found that plaintiffs were entitled to specific performance of the oral contract—an order granting Tellez equal control and ownership of ADPC. The court also ordered plaintiffs to choose between contract damages and specific performance. Plaintiffs elected specific performance of the oral agreement and agreed to forego the $1,100,000 in contract damages that the jury awarded on the breach of oral agreement and breach of the covenant of good faith and fair dealing causes of action.

On June 12, 2019, the trial court signed the judgment, reducing damages to $3,200,000 and requiring defendants to convey a one-half ownership interest in ADPC to Tellez. Defendants timely filed a notice of appeal.

On July 16, 2019, defendants filed another motion for new trial, reasserting their arguments from the first new trial motion and contending there were flaws in the judgment regarding specific performance. The trial court denied the motion and defendants filed a second timely notice of appeal.[6]

## IV. DISCUSSION

A. *Sufficiency of the Evidence*

Defendants contend that the trial evidence failed to support the judgment on the causes of action for breach of oral contract, breach of the covenant of good faith and fair dealing, rescission, fraud, constructive fraud, negligent representation, breach of fiduciary duty, and negligence, and the award of punitive damages.

### 1. Standard of Review

In assessing the sufficiency of the evidence supporting the jury's findings of fact, we apply a substantial evidence standard of review. (*In re Marriage of L.R. & K.A.* (2021) 66 Cal.App.5th 1130, 1146.) Our task is to decide "'whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted,' supporting the court's finding. [Citation.] 'We must accept as true all evidence . . . tending to establish the correctness of the . . . findings . . . , resolving every conflict in favor of the judgment.'" (*Sabbah v. Sabbah* (2007) 151

---

[6] We granted defendants' motion to consolidate the appeals.

13

Cal.App.4th 818, 822–823.)  If substantial evidence exists, "'"it is of no consequence that the [appellate] court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion."'" (*In re Marriage of DeSouza* (2020) 54 Cal.App.5th 25, 33.)  "'"Issues of fact and credibility are questions for the trial court."  [Citations.]'" (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.)

The burden is on an appellant to demonstrate, based on the record presented to the appellate court, that the trial court committed an error that justifies the reversal of the judgment. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 (*Denham*).) Further, "'[i]f any matters could have been presented to the court below which would have authorized the order complained of, it will be presumed that such matters were presented.'" (*Bennett v. McCall* (1993) 19 Cal.App.4th 122, 127.)  "'[I]f the record is inadequate for meaningful review, the appellant defaults and the decision of the trial court should be affirmed.'" (*Gee v. American Realty & Construction, Inc.* (2002) 99 Cal.App.4th 1412, 1416; *Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502 [observing that appellant has the burden of providing an adequate record and the failure to provide an adequate record on an issue requires that the issue be resolved against appellant].)

2.     Adequacy of the Record

The threshold problem for defendants' challenge to the sufficiency of the evidence is the absence of a reporter's trial transcript, or a suitable substitute such as an agreed or settled statement, from the first afternoon of the trial containing a

14

portion of Andrejich's testimony.  Defendants contend, in their reply brief, that they have not defaulted their sufficiency of the evidence arguments because the trial court erred in failing to grant a new trial based on the absence of the transcript.  We need not reach the merits of this contention as defendants raised it for the first time in their reply brief.  (*Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11.)

In any event, we would not reverse on this ground because defendants' trial counsel conceded, in his declaration supporting the new trial motion, that he failed to arrange for the proceedings to be transcribed on the first afternoon because he calculated that no relevant trial proceedings would occur then.  Thus, defendants are responsible for the inadequacy of the record on appeal.

Defendants also argue that any failure to provide a complete record on appeal is harmless because the record is adequate for this court to conduct its review, even without Andrejich's complete testimony.  And, they suggest that Andrejich's testimony was not outcome determinative.  But defendants' suggestion is at odds with their motion for new trial in which they maintained that Andrejich's testimony on the first afternoon of trial was critically important and that its absence from the record was irreparably prejudicial to their case.

As we explain below, the inadequate record is fatal to defendants' challenge to the sufficiency of the evidence supporting the verdicts on the breach of oral agreement and related causes of action and also hampers our ability to review defendants' other sufficiency of the evidence arguments.

### 3. Breach of Oral Agreement

Defendants contend that there was no evidence of mutual consent of certain and definite terms to support the breach of oral agreement verdicts. The record reflects that Andrejich was present during the meetings and conversations with Shaw that resulted in the oral and written agreements and was involved throughout the parties' business relationship. On the second and third day of trial, Andrejich authenticated various documents and testified about his interpretation of the MTA, and about Tellez's work and contributions to the development of the Wilson site, including the amounts Tellez paid to Shaw and his consultants. But any testimony that Andrejich provided about his initial conversations with Shaw, and the terms of the oral agreement that predated the LOI, was not transcribed. Because the testimony of the author of the LOI and witness to the oral agreement is not available for review by this court, the record is inadequate to consider the merits of defendants' challenge to the sufficiency of the evidence. (*Denham, supra*, 2 Cal.3d at p. 564.) We therefore affirm the verdict on the breach of oral contract claim.[7]

Defendants alternatively argue that even if plaintiffs proved the existence of an oral agreement, the breach of oral agreement cause of action would fail because the MTA's integration clause extinguished any oral agreement between the

---

[7] We also reject defendants' challenges to the verdict on the covenant of good faith and fair dealing and judgment for specific performance as they depend exclusively on the success of the challenge to the oral contract cause of action.

16

parties. This argument, however, is premised on defendants prevailing on their challenge to the jury verdict in favor of the rescission cause of action, an issue we discuss below.

Having concluded that defendants have failed to provide an adequate record on appeal, we could reject each of defendants' other sufficiency arguments on this ground. But, we need not do so because based on the record that we do have, we conclude there was sufficient evidence for each of the other challenged verdicts.

### 4. Rescission of the MTA[8]

A contract may be rescinded when "the consent [to the contract] of the party rescinding . . . was given by mistake[ ] or obtained through . . . fraud[ ] or undue influence[ ] exercised by . . . the party as to whom he rescinds . . . ." (Civ. Code, § 1689, subd. (b)(1).) When a person with the capacity of reading and understanding an instrument signs it, he is, absent fraud, bound by its contents, and estopped from contending its provisions are contrary to his intentions or understanding. (*Jefferson v. Department of Youth Authority* (2002) 28 Cal.4th 299, 303.) When, however, a person is induced to give consent based upon intentional and material misrepresentations, the contract is voidable and may be rescinded. (*Ibid.*; *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 415.)

---

[8] The "Rescission" cause of action was pled as an alternative to the cause of action for breach of the MTA. The jury returned a verdict finding that the MTA "should be rescinded."

17

According to defendants, because the material misrepresentations (which they deny Shaw made) were "'patently at odds with the express provisions of the written contract,'" any reliance by Tellez on these misrepresentations was unreasonable as a matter of law. We disagree.

Shaw assured Tellez that the MTA was a "preliminary" document that was required for operations to begin at the Wilson site. Further, Shaw promised Tellez and Andrejich that the MTA would be amended later to include the terms that were important to Tellez, including that Spliffin could be produced at the location. He further provided an explanation for why Spliffin was initially excluded from the MTA, namely, because Shaw "did not want anyone to know about it." On this record, the jury could have reasonably concluded that when Tellez signed the MTA, he did so in reasonable reliance on these misstatements.

To the extent defendants' challenge to the rescission verdict is based on Shaw's testimony at trial denying that he made the misrepresentations, the jury implicitly rejected that testimony. We do not revisit this finding on appeal. (See *Stafford v. Mach* (1998) 64 Cal.App.4th 1174, 1182 [an implied finding rejecting a witness's testimony is binding on the appellate court].) Sufficient evidence therefore supported the jury's finding that the MTA should be rescinded.

Because we affirm the verdict on rescission, the MTA "'becomes a nullity; it and each of its terms and provisions cease to be subsisting or enforceable against the other party.'" (*Holmes v. Steele* (1969) 269 Cal.App.2d 675, 677.) Therefore, we also reject defendants' argument that the MTA and its integration clause extinguished the oral agreement between the parties.

5.      Fraud

        The elements of intentional fraud and deceit are:
(a) material misrepresentation, concealment, or nondisclosure;
(b) knowledge of falsity; (c) intent to induce reliance;
(d) justifiable reliance; and (e) resulting damage.  (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 974.)
Unlike actual fraud, constructive fraud depends on the existence of a fiduciary relationship.  (*Younan v. Equifax Inc.* (1980) 111 Cal.App.3d 498, 516–517.)  The elements of constructive fraud are:  (1) fiduciary relationship; (2) nondisclosure (breach of fiduciary duty); (3) intent to deceive, and (4) reliance and resulting injury (causation).  (*Ibid*, fn. 14.)
        In challenging the verdict on the fraud cause of action, defendants contend that there was insufficient evidence that: Shaw made material misrepresentations or omissions; any reliance on such misrepresentations or omissions by Tellez was reasonable; and Tellez was harmed as a result.  The evidence at trial, however, demonstrated that Shaw made numerous misstatements to Tellez and Andrejich.  Indeed, even without a complete record of Andrejich's testimony, there was sufficient evidence that Shaw falsely stated that:  he would make Tellez a 50 percent equity owner of ADPC; Tellez was obligated to contribute only $1.5 million in capital toward the venture; Shaw would allow Spliffin to be produced at the Wilson site; and Shaw would amend the MTA.
        Further, the trial evidence demonstrated that Tellez's reliance on these misstatements and omissions was justifiable. In exchange for Shaw's promises, Tellez agreed to develop the Wilson site into a cannabis cultivation facility and dispensary;

19

provide $1.5 million in funding for the renovation; and operate the facility when it was finished. Given the significant amount of money and labor that Tellez agreed to contribute to the venture, it was not unreasonable for him to rely on Shaw's promise that he too would provide significant contributions.

Finally, that Tellez contributed both money and labor toward the joint venture was sufficient evidence of harm.

Defendants raise the same arguments in their challenge to the verdict on constructive fraud and we reject them for the same reasons. In addition, they contend that "there [was] no substantial evidence of a fiduciary or confidential relationship" between the parties or sufficient evidence of a breach. As discussed above, there was sufficient evidence that Tellez and Shaw, as partners in a joint venture, were engaged in a fiduciary relationship. Plaintiffs also presented sufficient evidence that Shaw breached his duties throughout the relationship by failing to participate and cooperate in the development and operation of the joint venture; by refusing to grant Tellez an equity interest in ADPC; by refusing to amend the MTA; and by refusing to provide information to Tellez. Thus, there was sufficient evidence to support both the actual and constructive fraud verdicts.

### 6. Negligent Misrepresentation

The elements of negligent misrepresentation are (1) misrepresentation of a past or existing material fact; (2) without reasonable ground for believing it to be true; (3) with intent to induce another's reliance on the fact misrepresented; (4) ignorance of the truth and justifiable reliance on the misrepresentation by the party to whom it was directed; and

20

(5) resulting damage. (*Hydro-Mill Co., Inc. v. Hayward, Tilton & Rolapp Ins. Associates, Inc.* (2004) 115 Cal.App.4th 1145, 1154.) Negligent misrepresentation "does not require intent to defraud but only the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true." (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1255.)

We have already concluded that there was sufficient evidence to support a finding that Shaw made material misrepresentations. Defendants additionally contend that the theories of negligent misrepresentation that were based upon the allegations that Shaw misrepresented himself as an expert in the cannabis business cannot survive because Shaw's statements about his background were either true or merely statements of opinion. Actionable misrepresentations arise "(1) where a party holds himself out to be specially qualified and the other party is so situated that he may reasonably rely upon the former's superior knowledge; (2) where the opinion is by a fiduciary or other trusted person; (3) where a party states his opinion as an existing fact or as implying facts which justify a belief in the truth of the opinion. [Citation.]" (*Borba v. Thomas* (1977) 70 Cal.App.3d 144, 152; see also *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 408 ["When a statement, although in the form of an opinion, is 'not a casual expression of belief' but 'a deliberate affirmation of the matters stated,' it may be regarded as a positive assertion of fact"].)

We need not decide the merits of this argument because there was sufficient evidence that Shaw made numerous other misstatements that support the verdict on the negligent misrepresentation cause of action. (See, e.g. *Bresnahan v.*

21

*Chrysler Corp.* (1998) 65 Cal.App.4th 1149, 1153–1154 [holding that verdict will not be disturbed on appeal if a claim is supported by substantial evidence under any theory, even though another theory submitted to the jury in support of the claim is without any evidence to support it].) In any event, the argument fails on its merits. The evidence at trial demonstrated that Shaw was a partner, and therefore fiduciary, to Tellez. Further, Shaw had been engaged in the business of cultivating cannabis since the early 2000s. Thus, a jury could reasonably conclude that when Shaw held himself out as an expert on legal compliance issues related to the cannabis industry, he was making a positive assertion of fact. A jury could also reasonably conclude that ADPC's outstanding tax liability and Shaw's changing advice on the legality of operating Spliffin at the Wilson site demonstrated that Shaw was not in fact an expert on compliance issues.

### 7. Breach of Fiduciary Duty and Negligence

Defendants next challenge the verdicts on the breach of fiduciary duty and negligence causes of action on the ground that there was no evidence of any fiduciary relationship between the parties that gave rise to any duties. In the alternative, Shaw argues that even if such a fiduciary relationship existed, there was insufficient evidence that he breached it. We have already rejected both arguments above.

### 8. Punitive Damages

Defendants complain that there was no evidence that they engaged in conduct that would warrant punitive damages and

22

that the trial court therefore erred in failing to grant a new trial based on excessive punitive damages. An award of punitive damages is appropriate where the evidence shows the defendant acted with "oppression, fraud, *or* malice." (Civ. Code, § 3294, subd. (a), italics added.) In this context, "malice" is defined as conduct that the defendant intends to cause "injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (*Id.*, § 3294, subd. (c)(1).) "Oppression" is "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (*Id.*, § 3294, subd. (c)(2).)

The evidence in support of the fraud and constructive fraud causes of action also support the awarding of punitive damages. (Civ. Code, § 3294, subd. (a).) In addition, Shaw's intentional conduct in taking over the Wilson site with armed guards was sufficient evidence of "a willful and conscious disregard of the rights or safety of others" that supported punitive damages under Civil Code section 3294. Plaintiffs presented evidence that Shaw's takeover of the facility was so dangerous, chaotic, and frightening that the police were summoned. (*Taylor v. Superior Court* (1979) 24 Cal.3d 890, 894 [recognizing "'[w]here the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime, all but a few courts have permitted the jury to award in the tort action "punitive" or "exemplary" damages . . .'"].) Consequently, we conclude there was substantial evidence to support the punitive damages award.

23

B.      *Challenges to Verdict Form*

We next consider defendants' argument that the trial court erred in failing to grant a new trial on the grounds that the verdict form was defective and that flaws in the verdict form resulted in an award of excessive damages.

1.      <u>Background</u>

Neither party had submitted a proposed verdict form to the trial court when trial began on December 7, 2018.  The trial court therefore requested that the parties submit their respective proposed verdict forms no later than the morning of December 14, 2018.  Defendants' counsel agreed to comply with the request, but there is no indication in the record that he did so.  Plaintiffs' counsel proposed general verdicts, but defendants wanted to use special verdicts.  The verdict form was still not finalized when the court released the jurors to begin deliberations on December 17, 2018.  Defendants' counsel had submitted his form in the wrong format, so the court clerk returned it.  When the court inquired if the parties would agree to use the general verdict form, defendants' counsel insisted on special verdicts.  The court directed counsel to work together to prepare the verdict form.  Counsel did so and the form they jointly deemed acceptable was given to the jury.

After the verdicts were announced, the jurors were polled and they confirmed the verdicts.  At that time, defendants' counsel did not object to the verdicts, and the trial court discharged the jury.

24

In their motion for a new trial, defendants argued, among other things, that the verdicts were ambiguous and defective because they failed to require the jury to make factual findings on each cause of action, failed to apportion liability between the defendants, and permitted the jury to award excessive damages. The trial court disagreed, concluding that defendants forfeited any objection to the form of the verdict by stipulating to the form used and failing to object before the jury was discharged. The court also concluded that defendants failed to demonstrate any error regarding the verdict form.

2. <u>Analysis</u>

Defendants argue that the trial court erred in denying their motion for new trial because they had no meaningful opportunity to present their verdict form or object to the one presented to the jury. The record belies their contention. Defendants had ample time to prepare the verdict form prior to trial and even after it began. Yet they failed to submit their verdict form until shortly before the jury began deliberating and then submitted their verdict form in an improper format. When the court provided them yet another opportunity to prepare a verdict form, defendants worked with opposing counsel to prepare and submit the verdict form. At that point, the court inquired of counsel whether they both agreed to the form of the verdicts, and defendants' counsel affirmed his agreement. Under these circumstances, defendants cannot now complain about the form of the verdicts that they submitted. (See *Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265, 1287 [claim that special verdict form did not adequately address defendant's negligence was

25

waived when plaintiffs failed to submit special verdict form addressing the alleged negligence]; see also *Morales v. 22nd Dist. Agricultural Assn.* (2016) 1 Cal.App.5th 504, 534–535 [objection to the form of questions in a verdict must be timely raised in the trial court or the issue is waived on appeal].)

Moreover, after the jury rendered its verdicts and was polled, defendants did not raise any concern about the verdicts with the trial court.  Nor did they ask to have the jury correct or clarify the verdicts before the court discharged them.  (Code Civ. Proc., § 619 ["When the verdict is announced, if it is informal or insufficient, in not covering the issue submitted, it may be corrected by the jury under the advice of the court, or the jury may be again sent out"].)  When a purported defect in the verdict form is apparent at the time the jury renders its verdict, the failure to object and request clarification or further deliberation before the court discharges the jury precludes a party from later challenging the validity of the verdict.  (See *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1242–1243 [challenge to jury's skipping questions on confusing verdict form forfeited where "appellant did not raise the defective verdict issue until after the jury had been discharged"].)

In arguing against forfeiture, defendants cite *Saxena v. Goffney* (2008) 159 Cal.App.4th 316 (*Saxena*), for the proposition that "courts have declined to apply the waiver rule 'where the record indicates that the failure to object was not the result of a desire to reap a "technical advantage" or engage in a "litigious strategy."'" (*Id.* at pp. 327–328.)  *Saxena,* however, is distinguishable.  The defendant in that case did not challenge the "verdict form as such . . . [but] merely argue[d] the verdict form submitted by plaintiffs, and the verdict returned by the jury [did]

26

not support entry of judgment on a battery theory." (*Ibid.*) Further, the court concluded that the defendant had not waived his argument on appeal because he had raised it in a demurrer and objection to jury instructions. (*Ibid.*)

Even if we were to consider the merits of defendants' challenge to the verdict form, we would reject it. Defendants complain that the purported "special verdict form" failed to ask the jury to make certain findings. Contrary to defendants' characterization, the verdict form here was a general one. It did not ask the jury to make findings on the elements of the underlying causes of action, but instead generally asked the jury to make conclusions on each cause of action and, when the conclusion was in plaintiffs' favor, to award damages. (*Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1347, fn. 7.) It therefore implied a finding in favor of the prevailing party of every fact essential to support that party's action or defense, and we will indulge all inferences in favor of a general verdict. (*Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 678; see *Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1193.)

Finally, we reject defendants' related claim that the flawed verdict form resulted in excessive damages because it allowed for a double recovery on the causes of action.[9] Here, the tort and contract claims were supported by multiple facts and independent evidence. Plaintiffs presented evidence that Shaw

---

[9] We observe that defendants do not claim that the amount of the damages awarded are excessive because sufficient evidence does not support them. Instead, they argue that the damages are excessive because the verdict form permitted the jury to award duplicative damages.

27

made numerous misrepresentations and breached his agreement with Tellez in various ways.  Thus, the jury had multiple distinct grounds upon which to reach a verdict on each of the causes of action.  Because the causes of action are not necessarily based on a single event or the same evidence of misconduct, and because the verdicts are general, defendants have not demonstrated that the damages awarded resulted in an improper double recovery. (*Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1155 ["by reason of the 'general verdict rule,' it is unnecessary to determine whether every count or theory of recovery is legally valid and supports the general verdict, but only whether any *one* such theory is valid and supports that verdict"].)  Further, the jury was instructed that "[p]laintiffs seek damages from [defendants] under more than one legal theory.  However, each item of damages may be awarded only once regardless of the number of theories alleged." We assume that the jury followed that instruction (*People v. Sanchez* (2001) 26 Cal.4th 834, 851) when it awarded different damage awards.

## IV.  DISPOSITION

The judgment is affirmed.  Plaintiff is entitled to costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


KIM, J.


We concur:


RUBIN, P. J.


BAKER, J.